GUARANTY TRUST CO. OF NEW YORK et al. v. MISSOURI PAC. RY. CO.

(District Court, E. D. Missouri, E. D.   November 28, 1916.)

No. 4540.

1. RAILROADS ⬅195(1)—RECEIVERSHIP—REORGANIZATION.
    Courts have come to recognize that modern railroad receiverships are in many cases but instruments for consummating plans of reorganization, and so far as properly can be the judicial proceeding is conducted in harmony with the plan; but the court has and will exercise authority to see that all equitable rights in or connected with the property are secured, and this duty becomes specific and imperative upon the complaint of an interested party.
    [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 656, 658, 660; Dec. Dig. ⬅195(1).]

2. RAILROADS ⬅195(1)—RECEIVERSHIP—OBJECTIONS TO PLAN OF REORGANIZATION.
    Where a plan for reorganization of a railroad company whose property in the hands of a receiver is submitted to bondholders for their individual acceptance or rejection, they are not represented in such matter by the trustee of the mortgage securing their bonds, but may appear individually or by a committee to object to the plan; and they are not required to wait before intervention until after a decree of foreclosure has been entered and carried out by a sale of the property, and the time limited for acceptance of the reorganization has expired, but should more properly come in while such matters are pending and undisposed of.
    [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 656, 658, 660; Dec. Dig. ⬅195(1).]

3. RAILROADS ⬅195(1)—REORGANIZATION OF SYSTEM—INCLUSION OR EXCLUSION OF BRANCH LINES.
    On reorganization of a railroad system, the advisability of including or excluding a particular subsidiary line, and the terms in which it may be included, depending on its relation and value to the system as a whole and the necessities of the reorganization, present questions which must be left largely to the business judgment of those in charge, and the court should not interfere, unless in an exceptional instance of fraud or grossly inequitable discrimination.
    [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 656, 658, 660; Dec. Dig. ⬅195(1).]

4. RAILROADS ⬅195(1)—REORGANIZATION OF SYSTEM—EQUITIES OF BONDHOLDERS OF SUBSIDIARY LINE.
    On reorganization of a railroad system, first mortgage bondholders of a subsidiary line, whose bonds were also assumed by the principal company on its purchase of the line, occupy a dual position: First, as mortgagees of the particular line; and, second, as general creditors of the purchasing company; and their rights should be recognized in both relations, by giving them the benefit of their security, its value to be agreed on or determined by a foreclosure and sale, and by giving them the status of general creditors as to any deficiency.
    [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 656, 658, 660; Dec. Dig. ⬅195(1).]

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by the Guaranty Trust Company of New York and Benjamin F. Edwards, as trustees, against the Missouri Pacific Railway Company. On motion of complainants to strike from the files the intervening petition of the Boisot committee of bondholders, objecting to the plan of reorganization. Motion denied.

Nagel & Kirby, of St. Louis, Mo., and Stetson, Jennings & Russell, of New York City, for the motion.

Winston, Payne, Strawn & Shaw, of Chicago, Ill., for the Boisot committee.

HOOK, Circuit Judge. This is a suit to foreclose a mortgage upon the Missouri Pacific Railroad. The present matter for consideration is a motion of the plaintiffs to strike from the files or dismiss the intervening petition of the Boisot committee, which attacks the plan of reorganization as inequitable.

The Boisot committee represents a large majority of the $1,024,000 of first mortgage bonds, series A, of the Kansas City Northwestern Railroad Company. The bonds are a first lien upon 161.65 miles of road extending northwestward from a connection with the Missouri Pacific at Kansas City, Kan., with a branch into Nebraska. The road has been owned and operated for quite a number of years as part of the Missouri Pacific system. In the deed by which the Missouri Pacific Company acquired the road it assumed and agreed to pay as part of the consideration the above-mentioned series A bonds, and also series B of the same issue, aggregating $2,983,000 and secured by the same mortgage. The series B bonds, not involved here, were held by the Missouri Pacific Company, and were subsequently deposited by it under the mortgage to the plaintiff trustees now being foreclosed in this suit. The plan of reorganization tenders to the holders of Kansas City Northwestern series A bonds preferred stock of a company through which the reorganization is to be worked out, and which for convenience may be called the New Company. The Boisot committee complains that this is inequitable and discriminating.

A brief statement of the outline of the proposed reorganization is essential to an understanding of the complaint. The plan contemplates the amalgamation of the Missouri Pacific and the St. Louis, Iron Mountain & Southern Railroads, and, excepting certain underlying bonds that will remain undisturbed, a readjustment of their entire debt and outstanding stock, with the following result:

| | |
|---|---|
| Old obligations of both companies to remain undisturbed..... | $128,458,620 |
| New first and refunding 5 per cent. bonds.................... | 46,923,150 |
| New general mortgage 4 per cent. bonds...................... | 44,399,292 |
| Total funded debt........................................ | $219,781,062 |
| New preferred stock, 5 per cent., cumulative from June 30, 1918 | $ 76,751,635 |
| New common stock........................................ | $ 82,839,585 |

The mortgage to secure the new 5 per cent. bonds will be open to a maximum limit of three times the amount of the stock, or approximately $250,000,000, to take care of future needs. The amounts of

the new bonds and stocks to be issued as above shown are estimated, because of certain options given to holders of old securities, a con-vertible feature of the preferred stock, and the authority of those in charge to make changes in the plan. But the figures set forth show in a substantial and general way the structure and arrangement of the proposed reorganization. The unsecured debt of the old companies, not paid by the receiver, is estimated as not exceeding $1,000,000. For the principal of this unsecured debt new preferred stock at par is offered, subject to the approval of the court. In this connection the court takes notice that, in addition to the above amount, the receiver has paid and discharged a substantial amount of unsecured debts and liabilities of the old companies from funds in his hands. There is but $45,135 of stock of the Iron Mountain Company in the hands of the public. For it the plan tenders preferred stock of the New Company at par. The existing stock of the Missouri Pacific Company in the hands of the public amounts to $82,839,585. The plan tenders the holders of it an equal amount of common stock of the New Company at par, upon payment of $50 per share of their respective holdings, and for the $50 per share so paid they will be given an equal amount of new 4 per cent. bonds. The cash amount realized from the payments upon the exchange of common stock (including those by underwriters, who take the place of nonparticipating old stockholders) will be $41,419,792. This money will be used as follows: (a) To pay Missouri Pacific Company extended gold notes, $24,773,-000; (b) to pay certain equipment trust obligations of both old companies, $2,270,000; leaving (c) $14,376,792 for various minor liabilities, working capital for the New Company, new equipment, immediate improvements, reorganization costs, etc.

[1] At the threshold lies the question of the relation of a court which appoints receivers of a railroad to a reorganization thereof by the security holders. There is no doubt but that bondholders have a right, upon default, to a strict foreclosure and sale according to the terms of their mortgages and the applicable statutes, and to leave the holders of junior securities, unsecured creditors, and stockholders to protect themselves as best they can. But in practice, on a large scale, and except in cases of utter insolvency, that is rarely done in these days. If the financial difficulties resulting in receivership are not mortal, but are mere embarrassments, which may be relieved by time and readjustment, the custom is a reorganization, embodying a recognition of all interests—bonds and other lien debts, general debts, and stocks—as far down the scale of preference as the value of the property and sound business judgment reasonably justify. As was said in Louisville Trust Co. v. Louisville, etc., Ry., 174 U. S. 674, 683, 19 Sup. Ct. 827, 830 (43 L. Ed. 1130):

"We must therefore recognize the fact, for it is a fact of common knowledge, that, whatever the legal rights of the parties may be, ordinarily foreclosures of railroad mortgages mean, not the destruction of all interest of the mortgagor and a transfer to the mortgagee alone of the full title, but that such proceedings are carried on in the interests of all parties who have any rights in the mortgaged property, whether as mortgagee, creditor, or mortgagor."

The considerations which have led to such reorganizations in place of strict insistence upon contractual and legal rights are not important here. It has sometimes been claimed that plans of reorganization formulated by bondholders and stockholders of a railroad in the hands of receivers are exclusively of private concern, free from judicial action or interference. But for various reasons the view cannot be sustained in principle. After all that can be said from the standpoint of theory and strict right, the fact remains that many railroad receiverships, and the one here is typical of them, are but instruments for consummating plans of reorganization, and courts have come to realize that such use of their jurisdiction and processes entails a correlative duty to those affected by the result. Generally, in such cases, the principal parties to the suits are adversary only in name, and the existence of the collateral agreement or understanding sought to be consummated is suggested by the face of the pleadings. The relation between the receivership which ensues and the plan of reorganization agreed upon is close and intimate. So far as properly can be, the judicial proceeding is conducted in harmony with the plan, and the success of the agreed readjustment is promoted by the orders of the court and the acts of its receivers. Generally the judicial course would not be different if the court were carrying out a plan of reorganization of its own making or one affirmatively adopted by judicial order or decree. It is not meant by this that a court should insist on engaging with the security holders in formulating the terms of readjustment, but that the plan put out by them may and usually does have such relation to and dependence upon its judicial action that it is its duty to take cognizance of it and act accordingly. While it is the settled doctrine that reorganizations will be encouraged, yet, on the other hand, a court of equity will not lend its aid to one that is inequitable or oppressive. In the Louisville Case, supra, the court said:

"We may observe that a court, assuming in foreclosure proceedings the charge of railroad property by a receiver, can never rightfully become the mere silent registrar of the agreements of mortgagee and mortgagor. It cannot say that a foreclosure is a purely technical matter between the mortgagee and mortgagor, and so enter any order or decree to which the two parties assent without further inquiry. No such receivership can be initiated and carried on unless absolutely subject to the independent judgment of the court appointing the receiver; and that court in the administration of such receivership is not limited simply to inquiry as to the rights of mortgagee and mortgagor, bondholder, and stockholder, but considering the public interests in the property, the peculiar circumstances which attend large railroad mortgages, must see to it that all equitable rights in or connected with the property are secured."

An additional reason for the duty of a court was given in Northern Pacific Ry. v. Boyd, 228 U. S. 482, 33 Sup. Ct. 554, 57 L. Ed. 931. There the Supreme Court referred to the rule that a private contract between bondholders and stockholders, whereby the corporate property was transferred to a new company having the same shareholders, was void in equity as to a nonassenting creditor, and also to the doubt that once existed whether a court could permit a foreclosure sale which left any interest in the stockholders. And it said

that it is now settled that, since those who invoke the aid of a court of equity must do equity, a reorganization relying on a judicial decree to subject the property may bind creditors who do not accept fair terms. Still another consideration was expressed by the Circuit Court of Appeals of this circuit in Western Union Telegraph Co. v. United States & M. T. Co., 221 Fed. 545, 137 C. C. A. 113. It said:

> "The property of an insolvent railroad corporation in the custody of a court in a suit to foreclose a mortgage upon it is charged with a trust for the benefit, first, of the holders of preferential claims superior in equity to the lien of the mortgage; second, of the holders of the lien of the mortgage and of other such liens in their order of priority; third, of the unsecured or general creditors of the mortgagor; and, fourth, of its stockholders."

The conclusion is manifest that the general duty of a court in a railroad foreclosure suit to take cognizance of a plan of reorganization by the bondholders and stockholders which is to be aided by its decree, and to protect the equitable rights of all, becomes specific and imperative upon the complaint of an interested party.

[2] It is urged in support of the motion that the objection to the plan of reorganization should have been made by the trustee of the mortgage securing the series A bonds in question, and not by the bondholders or their committee. But, as is the practice, the offer of the plan is to the bondholders individually for their several acceptance or rejection. It does not call for the performance of a duty or the exercise of a power vested exclusively in the trustee. The acceptance or rejection of the plan affects the personnel of the bondholders, like a sale of their holdings in the market, rather than an action under their mortgage. Besides, the tender of the plan involves the assumed obligation of the Missouri Pacific Company to pay the bonds, which, so far as appears, was subsequent to and independent of the mortgage.

It is also contended that the intervention is premature; that it should not have been made before decree in the main case, or before the sale in foreclosure and motion to confirm. It is argued in this connection that objecting creditors must either accept the offer made them in the plan or stay out until the time above mentioned and risk their rights. The effect of the contention is that objections to the fairness of a plan of reorganization cannot be made until about the end of the proceedings in court, and if the court should then decide the offer was a fair one, the objectors not having accepted it would lose their right, if in the meantime the period limited in the plan for acceptance had expired. In the case here the time expired after the intervening petition was filed. No considerations of convenience in reorganization can justify a rule that would work that way. In most of the reported cases the objections by creditors were presented at or after the normal end of the court proceedings. Louisville Trust Co. v. Louisville, etc., Ry., 174 U. S. 674, 19 Sup. Ct. 827, 43 L. Ed. 1130; Northern Pacific Ry. v. Boyd, 228 U. S. 482, 33 Sup. Ct. 554, 57 L. Ed. 931; Id., 177 Fed. 804, 101 C. C. A. 18; Kansas City Southern Ry. v. Guardian Trust Co., 240 U. S. 166, 36 Sup. Ct. 334, 60 L. Ed. 579; Central Improvement Co. v. Cambria Steel Co., 210

Fed. 696, 127 C. C. A. 184; Id., 201 Fed. 811, 120 C. C. A. 121; Western Union Telegraph Co. v. United States & M. T. Co., 221 Fed. 545, 137 C. C. A. 118. But that was a casual or adventitious circumstance, and not according to a settled rule of practice. On the contrary, the rule that has been settled requires a diligent assertion of objections, and it is for the protection of the reorganization and those participating in it against belated attacks.

There are several points of similarity between the Louisville Case, supra, and the case at bar. There a single creditor objected; here a committee representing creditors. There the creditor held bonds which the principal railroad company had guaranteed; here the creditors hold bonds which the Missouri Pacific Company assumed and agreed to pay. There, as here, there was first a creditors' bill in harmony with the interests of the debtor company, a receiver was appointed, bills to foreclose mortgages were filed, and an order of consolidation entered. There, as here, the intervening creditor charged the formation of a plan of reorganization by bondholders and stockholders pursuant to which the railroad was to be purchased at foreclosure sale. In that case the creditor applied for and was given leave to intervene the day the decree of foreclosure was entered. The intervening petition was filed about a month later, but before the sale. Of a defense of laches the Supreme Court observed:

"It is said by the appellee that the Louisville Trust Company [the creditor] was dilatory, and that by reason thereof it was not entitled to consideration in a court of equity. There is some foundation for this contention, and yet there was not such delay as justified the court in refusing to enter upon an inquiry."

One of the reasons given was that the original creditors' bill was instituted for the benefit of all creditors "according to their due equities and priorities," and the creditor in question might well have awaited some notice for it to come in. The conclusion of the court is quite inconsistent with the contention made here that the intervention of an objecting creditor before decree or sale and confirmation is premature, and should be dismissed.

Finally, it is said that the right of the plaintiffs to a decree is not affected by the intervention. That might be so in a pure case of foreclosure by the bondholders, but it necessarily follows from what has been said that, where the proceedings in court are but means to effect a reorganization in which interests of stockholders are recognized and preserved, the right to a decree is not absolute, but is subject to the same considerations as attend the foreclosure sale or its confirmation. But as the duty of the court may as well be performed later, no useful purpose will be subserved in delaying the decree.

We come to the objections of the Boisot committee to the plan of reorganization. Complaint is made of the offer of new preferred stock for the series A bonds in comparison with the offer to the old stockholders. Passing for the time the mortgage security back of those bonds, and regarding them as general indebtedness of the Missouri Pacific Company, because of its assumption and agreement to pay, no inequitable discrimination in favor of the old stockholders is per-

238 F.—52

ceived. The normal relation between the two, general creditor and stockholder, is preserved. The common stockholder is always last in the scale. Here the general creditor is just before him, and his priority is preserved by preferred stock of the New Company. In this, as in most cases of the kind, the success of the reorganization and the future of the New Company depend upon the conversion of more or less of the indebtedness into income bonds, preferred stock, or common stock, and a consequent lessening of fixed charges. The acceptance of such new securities is a just and necessary concession to prior lien holders, who refrain from strictly enforcing their rights. In this case the old stockholders are required to pay in cash 50 per cent. of the par of their holdings. They will receive for their cash payments new 4 per cent. bonds at par. In order, these bonds will come just ahead of the preferred stock. They will be inferior to all the other bonded indebtedness, and their subordinate position in that respect, and their rate of interest, taken together, make it doubtful that they will soon, if ever, be worth par. This will operate as an assessment upon the common stock to the amount of the discount. That the stockholders will be given such bonds for their cash payments is not inequitable to general creditors. They will pay more than they will get in value; but if they paid nothing, and received no bonds, still the relation between them and general creditors would not be disturbed. Besides, the raising of money from some source is imperative, and that raised from the stockholders will be for the benefit of the enterprise as a whole.

[3] Complaint is also made that the holders of the bonds on four other branch or subsidiary lines are offered the same or better terms, and comparisons are made between those lines and the Kansas City Northwestern as regards values of the properties and amounts of incumbrance. But there are other considerations than those. The relation of a particular railroad to the system as a whole, its value to the system on that account, and the advisability of including or excluding it, in view of the necessities of the reorganization, enter into the problem. A court cannot well review such matters, but must leave them largely to the business judgment of those in charge. It would, perhaps, be going too far to say a court should never interfere on a complaint of that kind; but clearly it should not do so unless in an exceptional instance of fraud or grossly inequitable discrimination. Generally the objection to a plan of reorganization should involve a definite principle, and not require a long complicated investigation of values, properties, etc. As to this an analogy may be found in the opinion of the Supreme Court on a phase of the Boyd Case.

Objections are also made to the proposed disposition of the money realized from payments on the exchange of common stock, shown by divisions (a) and (c) above mentioned. What has already been said sufficiently disposes of them. But in the case of the extended gold notes of the Missouri Pacific Company it may be added that they matured during the receivership and the court found that the equity in the deposited collateral was so substantial and valuable that it author-

ized the receiver to preserve it by securing an extension of the notes upon terms which included additional security.

[4] The above are all the objections to the plan of reorganization specifically set forth in the intervening petition, and, were nothing else to be said, the petition should be dismissed. But another question arises from the face of the petition, the attached copy of the plan, and the intervener's prayers for relief. As was said in the Louisville Case, it is the duty of the court to "see to it that all equitable rights in or connected with the property are secured." The question was referred to at the argument, and unless disposed of now it will return to affect the reorganization. As already indicated, the holders of the series A bonds occupy a dual position. First, they have a first mortgage lien upon the Kansas City Northwestern Railroad at the rate of $6,347 per mile. It is averred that the mortgage covers valuable terminals and team tracks in Kansas City, Kan., in regular use by the Missouri Pacific Company, and a railroad bridge across the Kansas river, also used by it and by the Chicago Great Western Railroad Company, its lessee. Second, they hold the independent contract of the Missouri Pacific Company to pay the bonds, which undoubtedly was intended and has been regarded as an additional and valuable security. But the plan is so framed that, if they insist upon their mortgage security, they lose their rights as creditors under the contract. In other words, the tender of preferred stock would not in that case be open to them for any part of their demands. On the other hand, if they accept the offer of preferred stock, they must abandon their mortgage. In that case they would get no more than a general creditor with no security whatever. These bondholders became creditors of the Missouri Pacific Company by virtue of its contract, irrespective of the Kansas City Northwestern mortgage, and, as such, their rights were equal to those of all general creditors, and superior to those of the stockholders. It does not seem equitable that, to maintain that parity and priority, they should be required to abandon their mortgage. Other general creditors, to whom preferred stock is offered, have nothing and give up nothing of security, but their proper relation to the old stockholders is fairly recognized.

The situation reduces itself to this: Whether those conducting the plan of reorganization decide to include the Kansas City Northwestern Railroad in the new system or to exclude it, consideration should be given to the mortgage securing the series A bonds, and after the application of the value or proceeds of the mortgaged property determined by agreement or by foreclosure and sale the deficiency should have equitable recognition in the plan as a general debt. The position of the intervening bondholders is a hard one. It is said the rolling stock on hand when their mortgage was given has been used up and that the railroad is now practically without equipment. Being investors, not operators of railroads, naturally they do not want it. On the other hand, the undecided purpose of those in charge of the reorganization hampers them in making the most advantageous disposition of their interest to some other railroad company. The par-

ties may be able to reach an amicable, equitable adjustment, so there is no need to go further at this time.

The motion to strike from the files or dismiss the intervening petition will be denied.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes