NEW YORK TRUST CO. et al. v. CONTINENTAL & COMMERCIAL TRUST & SAV. BANK et al.*

GIBSON et al. v. CONTINENTAL & COMMERCIAL TRUST & SAV. BANK et al.

Circuit Court of Appeals, Eighth Circuit.

June 1, 1928.

Nos. 7802, 7855.

1. Street railroads ⬩�côm⟩55—Actual value of street railroad property is not determinable by evidence of value for rate-making and capitalization purposes.

Evidence of value of street railroad property for rate-making and capitalization purposes affords no proper or legal criterion for determining actual value of property.

2. Street railroads ⬩⟩55—Holders of first mortgage bonds had right, as against junior incumbrancers, creditors, or stockholders, to foreclose lien on property of substantially less value than amount due.

Holders of first mortgage bonds issued by street railroad had right to foreclose lien, where value of property was substantially less than amount due on first mortgage securities, and apply proceeds of sale thereof to payment of securities, without regard to rights of junior incumbrancers, creditors, or stockholders.

3. Corporations ⬩⟩566(5)—Stockholder cannot participate in distribution of assets until creditors' claims are satisfied.

A stockholder has no right to participate in distribution of assets of corporation until claims of creditors have been satisfied.

Appeals from the District Court of the United States for the Western District of Missouri; Kimbrough Stone, Judge.

Receivership suit by the Kansas City Refining Company against the Kansas City Railways Company, wherein the Continental & Commercial Trust & Savings Bank, as trustee under a first mortgage, James E. Gibson, and others intervened, and the New York Trust Company and others, as trustees under a second mortgage, filed a counterclaim, with the appearance, also, of several tort claimants. From a decree confirming a sale under the first mortgage, the New York Trust Company and others and James E. Gibson and others separately appeal. Affirmed.

Frank P. Sebree, of Kansas City, Mo. (Sam B. Strother, Sam B. Sebree, and William T. Campbell, all of Kansas City, Mo., on the brief), for appellants Gibson and others.

Blatchford Downing, of Kansas City, Mo. (Albridge C. Smith, of New York City, H. L. McCune and R. B. Caldwell, both of Kansas City, Mo., and Humes, Buck & Smith,

of New York City, on the brief), for appellants New York Trust Co. and others.

Henry Russell Platt, of Chicago, Ill. (Richard J. Higgins, of Kansas City, Mo., on the brief), for appellees Continental & Commercial Trust & Savings Bank and Swinney.

Powell C. Groner, of Kansas City, Mo., for appellees Kansas City Public Service Co. and Groner.

Silas H. Strawn and Walter H. Jacobs, both of Chicago, Ill., for committee of first mortgage bondholders.

Gilbert E. Porter and Buell McKeever, both of Chicago, Ill., for committee of collateral noteholders.

Inghram D. Hook, of Kansas City, Mo. (James A. Reed, of Kansas City, Mo., on the brief), for tort claimants, amicus curiæ.

Before WALTER H. SANBORN and LEWIS, Circuit Judges, and PHILLIPS, District Judge.

PHILLIPS, District Judge. These are appeals from an order confirming a mortgage foreclosure sale in the case of Kansas City Refining Company v. Kansas City Railways Company, a receivership suit.

The appellants in 7802 are trustees for the holders of second mortgage bonds of the Railways Company. The appellants in 7855 are certain holders of preferred participating certificates representing beneficial interests in the preferred stock of the Railways Company.

The receivership suit was instituted September 9, 1920, by the Refining Company, a general creditor. The Railways Company answered the bill and admitted the claim of the Refining Company and the allegations of the bill. A temporary receiver was appointed September 9, 1920, and shortly thereafter permanent receivers were appointed.

In addition to first mortgage bond and note holders and second mortgage bondholders, there were also certain so-called tort claimants, whose claims were based upon unpaid judgments recovered against the Railways Company for personal injuries or property damages aggregating $2,106,072.50.

On October 21, 1920, the trustees under the first mortgage filed their intervening petition and bill in the receivership suit to foreclose the first mortgage, which secured certain first mortgage bonds and certain additional first mortgage bonds pledged to secure promissory notes of the Railways Company.

The trustees under the second mortgage later filed an answer and counterclaim. In

this pleading they admitted the priority of the first mortgage and the validity of the bonds issued thereunder, but attacked the validity of the pledge of bonds to secure certain of such notes.

The tort claimants also appeared in the receivership suit and attacked the validity of the first and second mortgage liens, on the ground that the bonds issued were in excess of the amount authorized by the laws of the state of Missouri, and also on the ground that, under the provisions of the franchise granted to the Railways Company, claims and judgments for personal injuries were to be paid as a special operating expense prior to the claim of any trustee or bondholder under any mortgage on the property of the Railways Company, and for these reasons asserted that the claims of the tort claimants were prior and superior to the liens of the first and second mortgages.

Early in 1924, the appellants in 7855, Gibson and others, filed an intervening petition and answer in the receivership suit, in which they attacked the validity of the mortgages, bonds, and notes, and also set up substantially the same averments as the tort claimants.

Prior to the receivership suit, a protective committee representing all classes of securities had been formed. This committee was dissolved in 1922, and was succeeded by three independent committees, one of which represented the holders of first mortgage bonds sold outright, another represented the holders of notes secured by pledge of first mortgage bonds, and another the holders of second mortgage bonds.

In October, 1923, the protective committees, representing the first mortgage bonds and notes, appointed a so-called reorganization committee.

On November 22, 1923, the reorganization committee, representing the first mortgage security holders, entered into an agreement with the tort claimants. The substance of this agreement was that the parties would collaborate in an effort to obtain an equitable adjustment of the matters in controversy and a prompt reorganization and refinancing of the Railways Company; that the tort claimants should receive 50 per cent. of their claims in cash from funds in the hands of the court, as and when the court should by order allow and direct such payments, and that the remaining 50 per cent. of the tort claims should be paid in bonds of the new company. Following this, negotiations were instituted with other creditors, and offers made to them. The committee's offer to the

26 F.(2d)—55½

second mortgage bondholders was 2½ shares of new preferred and 2½ shares of new common stock for each $1,000 second mortgage bond. The reorganization committee failed in its efforts to reach an agreement with the second mortgage bondholders.

On April 4, 1924, the reorganization committee entered into an agreement with the tort claimants, modifying the previous November agreement. The principal modifications were that the tort claimants should withdraw the allegations of their pleadings attacking the validity and priority of the first mortgage securities; that the tort claimants would consent to a decree establishing the validity and priority of the first mortgage, the validity of the bonds secured thereby, and the validity of the pledge of such bonds to secure notes of the Railways Company; that the first mortgage security holders would make the 50 per cent. cash payment on the tort claims out of the cash applicable to their securities, should no cash payment be made from funds in the hands of the court because of objection made by any party; that, upon taking over the property, the first mortgage security holders would pay the remaining 50 per cent. in bonds of the reorganized company, but, if they should be unable to deliver such bonds or should not acquire the property, they would pay the balance due on the tort claims in cash.

Following this, the reorganization committee, which represented 96.6 per cent. in amount of the first mortgage securities, demanded a foreclosure and sale under the first mortgage. After a contested trial, the court on May 16, 1925, entered its final decree in foreclosure. The decree sustained the validity of the first mortgage and the securities issued thereunder. It adjudged that there were validly outstanding, and held by bona fide purchasers, first mortgage securities aggregating the principal amount of $25,067,400, which, with due and unpaid interest to the date of the decree, amounted to $33,505,703.26. It also adjudged that there had been validly issued, and were outstanding, notes secured by secondary pledges of first mortgage bonds in the principal amount of $1,797,000, which, with interest to the date of the decree, amounted to $2,421,261.31.

The amount due on the first mortgage securities, after deducting the cash in the hands of the receivers available for payment thereon, was $31,292,126.78.

· The decree also sustained the validity of the second mortgage lien and the bonds secured thereby, subject to the prior lien of

the first mortgage, and determined that there was due thereon for principal and interest to the date of the decree $6,600,167.10. It dismissed the petition of appellants Gibson and others. . It ordered that the Railways Company pay the amount of the first mortgage debt decreed to be due, and provided that, in default thereof, the property covered by the first mortgage lien should be sold in satisfaction of such debt. It contained the other usual foreclosure decree provisions.

John T. Harding, the special master appointed by the decree to make the sale of the mortgaged property, duly advertised the same to be sold on December 15, 1925. The sale was adjourned from the last-mentioned date to January 4, 1926. On the latter date, Powell C. Groner, representing the reorganization committee, made a bid of $8,000,-000. After inquiring whether any other party desired to bid, including a specific question to that effect to counsel for the second mortgage trustees, and after receiving negative answers, the master struck off the property to Groner, who thereupon deposited the required security as the successful bidder.

On January 8, 1926, the special master filed a verified report of sale. The usual decree nisi was entered, which fixed the dates for filing objections and for a hearing thereof. Objections and exceptions were filed by the second mortgage trustees and by the holders of preferred participating certificates. The court overruled the exceptions and objections, and on June 16, 1926, entered a decree confirming the sale.

The second mortgage bondholders contend that the sale was in effect a consummation of a reorganization plan, in which the first mortgage security holders and the tort claimants participated; that the tort claimants, whose claims were subsequent in priority to the second mortgage bondholders, received an equity which rightfully belonged to the second mortgage bondholders; and that these facts render such sale invalid under the principles laid down in Louisville Trust Co. v. Louisville, New Albany & Chicago Ry. Co. (the Monon Case) 174 U. S. 674, 19 S. Ct. 827, 43 L. Ed. 1130, Northern Pac. Ry. Co. v. Boyd, 228 U. S. 482, 33 S. Ct. 554, 57 L. Ed. 931, and Kansas City Terminal Ry. Co. v. Central U. Trust Co., 271 U. S. 445, 46 S. Ct. 549, 70 L. Ed. 1028, and for that reason the second mortgage bondholders are now entitled to a decree establishing a lien on the property of the Railways Company to the extent of the bonds and cash diverted and paid to the tort claimants.

The appellants Gibson and others contend that the value of the property was greatly in excess of the aggregate amount due on the first mortgage securities, second mortgage bonds, and the claims of the general creditors, and that the court should have compelled a reorganization plan which would have permitted the holders of preferred beneficial certificates to participate in the securities and stock of the new company.

On the other hand, the first mortgage security holders contend: First, that they made a bona fide outright purchase of the claims of the tort claimants, and paid for the same in cash and properties which came to them in liquidation of their first mortgage securities; second, that there was no voluntary plan of reorganization, but that they compelled, as was their right, the foreclosure of the first mortgage and the sale of the property secured thereby to satisfy the lien thereon, and the second mortgage bondholders knew, before the decree of foreclosure and sale was entered, this right was and would be relied on by the first mortgage bondholders; third, that the amount of the first mortgage indebtedness, after deducting the cash in the hands of the receivers available for application on such indebtedness, was far in excess of the actual value of the property, and that there was no diversion of any equity belonging to the second mortgage bondholders to the tort claimants.

[1] Counsel for the appellants contend that the value of the properties was in excess of the amount due on the first mortgage securities. This contention is predicated largely upon testimony of valuations given for rate making and capitalization purposes. Evidence of value for such purposes as was clearly pointed out by this court in Temmer v. Denver Tramway Co., 18 F.(2d) 226, affords no proper or legal criterion for determining the actual value of the property. We are convinced that an application of the recognized criteria for determining actual value to the facts disclosed by the record compels the conclusion that the actual value of the property of the Railways Company at the time of the foreclosure sale did not exceed $25,000,000.

[2] The right of the holders of securities secured by a first mortgage lien to insist on the foreclosure of their lien, the sale of the property, and the application of the proceeds to the payment of such securities is recognized in the authorities upon which appellants rely. See Kansas City Terminal Ry. Co. v. Central Union Trust Co., 271 U. S. 445, 454, 46 S. Ct. 549, 70 L. Ed. 1028; Louisville Trust Co. v. Louisville A. & C. R. Co., 174 U. S. 674,

683, 19 S. Ct. 827, 43 L. Ed. 1130; Guaranty Trust Co. v. Mo. Pac. Ry. Co. (D. C.) 238 F. 812, 814; Gay v. Hudson River Electric Power Co. (C. C. A. 2) 184 F. 689, 693, 694.

In Railways Co. v. Union Trust Co., supra, the Supreme Court said:

"If the bondholder wishes to foreclose, and exclude inferior lienholders or general unsecured creditors and stockholders, he may do so."

In Guaranty Trust Co. v. Mo. Pac. Ry. Co., supra, the court said:

"There is no doubt but that bondholders have a right, upon default, to a strict foreclosure and sale according to the terms of their mortgages and the applicable statutes, and to leave the holders of junior securities, unsecured creditors, and stockholders to protect themselves as best they can."

If such was the relief sought, and if the sale was bona fide and fairly conducted, we fail to see how junior incumbrancers or creditors or stockholders may complain under the facts in the instant case. It may be, in a case where the value of the property is substantially in excess of the amount of the first mortgage indebtedness and the circumstances are such that no one but the first mortgage bondholders are in a position to bid at the sale, a court of equity, if the first mortgage bondholders insist on foreclosure and sale, could fix an upset price and deny approval of the sale, unless the first mortgage bondholders bid an amount substantially equivalent to the fair value of the property. In this way the court might indirectly force a reorganization plan. Whether a court of equity has power so to do, we are not compelled here to determine, because we are convinced that the value of the property is substantially less than the amount due on the first mortgage securities.

[3] The vice in the Monon Case and similar cases was that they involved plans of reorganization for the carrying out of which the parties sought the affirmative aid of a court of equity, and in which first mortgage bondholders and stockholders participated to the exclusion of junior incumbrancers or general creditors. It is fundamental that a stockholder has no right to participate in a distribution of the assets of a corporation until the claims of all of the creditors have been satisfied.

In Railway Co. v. Central U. Trust Co., supra, the court said:

"Where the value of corporate property to be sold under foreclosure is so great as to render co-operation between bondholders and stockholders essential in order to secure a bidder and prevent undue sacrifice of their interests, they may enter into a fair and open arrangement to that end. But 'no such proceedings can be rightfully carried to consummation which recognize and preserve any interest in the stockholders, without also recognizing and preserving the interests, not merely of the mortgagee, but of every creditor of the corporation. In other words, if the bondholder wishes to foreclose and exclude inferior lienholders or general unsecured creditors and stockholders, he may do so; but a foreclosure which attempts to preserve any interest or right of the mortgagor in the property after the sale must necessarily secure and preserve the prior rights of general creditors thereof. This is based upon the familiar rule that the stockholders' interest in the property is subordinate to the rights of creditors; first of secured and then of unsecured creditors. And any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation.' "

It may be doubted that the doctrine of these cases should be extended to a plan of reorganization such as appellants assert was carried out in the instant case. However, it is our conclusion that the facts in the instant case do not present that question for determination. The trial court was of the opinion, and we think the facts support his conclusions, that the reorganization committee made a bona fide outright purchase of the claims of the tort claimants, that there was no general plan of reorganization in which the tort claimants participated to the exclusion of other creditors senior in right, and that the first mortgage security holders pursued, as was their right, the remedy of foreclosure and sale of the property, resulting in the exclusion of junior lien claimants, creditors, and stockholders. Some of the authorities refer to this right as the right of strict foreclosure. They do not thereby mean strict foreclosure in the technical sense of a proceeding in a court of chancery to cut off the equity of redemption, but refer rather to the modern remedy now afforded in courts of equity, where the lien theory of mortgages prevails, and where the court, upon condition broken, decrees and carries out a foreclosure sale of the mortgaged property for the benefit of the mortgage lien claimants. It was this latter remedy which the first mortgage security holders

invoked, as was their right, and they did not seek the aid of the court in consummating in lieu of such remedy a general plan of reorganization, in which the court could insist that all parties should be fairly and equitably dealt with.

There is another reason why we do not think the facts in this case present the question of whether the doctrine of the Monon and kindred cases should be extended to a reorganization plan in 'which first mortgage lien claimants and general creditors participate, to the exclusion of creditors of intervening priority. In the cases where stockholders were permitted to retain an interest, that fact indicated an equity in excess .of the first mortgage debt. The alleged fact that general creditors have participated with first mortgage lien claimants might, standing alone, compel a like conclusion; but here the proof clearly shows that there was no equity in excess of the amount due on the first mortgage securities, and the reorganization committee purchased the tort claims, not because of the existence of any such equity, and not because they desired the tort claimants to participate and aid in a voluntary reorganization, but rather to avoid litigation with such tort claimants, and to secure their good will, and avoid public protest and resentment in the future operation of the property.

What we have said as to the contentions of the second mortgage bondholders effectually answers the contentions of the appellants, Gibson et al.

It is therefore our conclusion that the first mortgage. lien security holders, having acquired, by a bona fide contract to purchase, the claims of the tort claimants, did not invoke the aid of a court of equity in the consummation of a plan of reorganization, but rather pursued and invoked, as was their right, the remedy of ordinary foreclosure and sale after condition broken; that the ·amount due for principal and interest on the securities secured by the first mortgage lien was substantially in excess of the actual value of the property covered by such lien; that the sale was fairly made and conducted, and resulted in no legal injury to the second mortgage bondholders and holders of preferred participating certificates; and that the court properly confirmed the sale. There were other minor questions raised as to the validity of the sale, which we have considered, and have concluded are . without merit.

The late Judge SANBORN sat in this case, presided during arguments and at our conference, and expressed his full concurrence in these conclusions.

The decree appealed from is therefore affirmed.