## GIBSON et al. v. KANSAS CITY REFINING CO. et al.

Circuit Court of Appeals, Eighth Circuit.
April 19, 1929.

No. 7953.

Frank P. Sebree, of Kansas City, Mo. (Sam B. Strother, Sam B. Sebree, and William T. Campbell, all of Kansas City, Mo., on the brief), for appellants.

Powell C. Groner, of Kansas City, Mo., for appellee Kansas City Public Service Co.

Henry Russell Platt, of Chicago, Ill., Richard J. Higgins, of Kansas City, Mo., and Silas H. Strawn, Walter H. Jacobs, Gilbert E. Porter, and Buell McKeever, all of Chicago, Ill., for appellees Continental & Commercial Trust & Savings Bank and others.

Blatchford Downing, of Kansas City, Mo., Albridge C. Smith, of New York City, and H. L. McCune and R. B. Caldwell, both of Kansas City, Mo., for appellees New York Trust Co. and others.

Before KENYON, Circuit Judge, and JOHNSON and FARIS, District Judges.

KENYON, Circuit Judge. This is an appeal from the final decree in the foreclosure of a first mortgage given by the Kansas City Railways Company (designated herein as Railways Company), upon its street railway system in Kansas City, Mo. Said decree was entered May 16, 1925, the Railways Company.

being at that time in receivership. Appellants were interveners, holding certain certificates representing a beneficial interest in the stock of said Railways Company, which had come to them by virtue of a certain plan of reorganization hereinafter explained. Their intervening petition was dismissed by the trial court on the ground that they were estopped from challenging the validity of the mortgage or any of the mortgage securities.

The properties of the Railways Company were sold in 1926 under the foreclosure by a special master to the Kansas City Public Service Company, one of the appellees, which now owns and operates the same. The court entered a decree confirming the sale. Appellants appealed from that decree, as did also the trustees under the second mortgage of the Railways Company. This court affirmed the confirmatory decree [New York Trust Co. v. Continental & Com. Trust & Sav. Bank, 26 F.(2d) 872], which opinion settles some of the contentions here made.

A brief statement of facts seems necessary. A number of companies, the principal one being the Metropolitan Street Railway Company, were engaged in rendering street railway and electric power and light service in Kansas City, Mo., prior to 1911, at which time they were placed in the hands of a receiver. The receivership continued for about five years under the direction of Circuit Judge Hook. A plan of reorganization was evolved, and the Kansas City Railways Company was organized, with an authorized capital stock of $100,000, divided into 1,000 shares, of $100 each. This company was to be the medium through which the reorganization was to be made effective. In 1914 it secured a new franchise from the city of Kansas City, which provided that the company should acquire the railway properties of the Metropolitan Company and its constituents pursuant to Judge Hook's plan, and also authorized the execution of a mortgage upon the property and issuance of bonds thereunder in aid of the contemplated plan of reorganization. Other provisions of the franchise are not necessary to be referred to.

The funded debt of the Metropolitan system at the time the reorganization plan was formulated amounted to $28,000,000, of which $25,000,000 was past due. The plan provided for segregation of the power and light properties into one company, and the vesting of the street railway properties in the Kansas City Railways Company. It provided for the court holding the issued stock of the Railways Company for the purpose of carrying out the plan, and directed the placing of mortgages upon the properties acquired by the Railways Company, and the issuance of bonds thereunder, some of which were to be delivered in payment for the properties, and some to be sold for cash to meet the financial requirements of the new company. It also arranged methods of participation by the various classes of security holders, and prescribed a complete procedure for the reorganization of the Metropolitan system. Some supplementary changes were made in the plan by Judge Hook whereby the stock of the Railways Company was transferred to three trustees, who were to hold the same under some kind of a trust agreement, and were to issue certificates representing beneficial interests therein to the stockholders who might become parties to the plan. Commissioners were appointed to carry out the arrangements. The beneficial certificates owned by appellants came to them out of this plan of reorganization. They could not have received the certificates, except by becoming parties to the plan.

The plan of reorganization meeting the approval of the majority of the security holders of the old companies, a final decree of foreclosure and sale was entered January 11, 1916, and the various properties under foreclosure were sold at auction and bid in as provided in the plan. The sales were confirmed by the court. On February 15, 1916, a deed conveying the street railway properties to the Railways Company was executed by the court's commissioners and receivers of the old companies. The Railways Company thus having acquired the properties, a special meeting of stockholders of said Railways Company was held on February 15, 1916, at which were represented 997 shares of stock out of the 1,000 issued. This meeting decided on the proposed mortgage, and the directors were authorized to execute and deliver the same, and also bonds for the purposes therein provided. All of the stock on deposit with the court, as provided in the franchise and by order of the court, was voted for the mortgage and bonds, as provided in the plan. A directors' meeting was held at the conclusion of the stockholders' meeting, and a resolution adopted directing the proper corporate officers to execute said mortgage, likewise the bonds thereunder, as specified, and the mortgage and its terms were approved. The mortgage was executed and recorded. It was approved by the city, by its city counselor, and was approved also by Judge Hook. The preambles to the mortgage contain the following:

"Whereas, the company is authorized and

empowered to borrow money and contract debts and issue and dispose of its obligations for money so borrowed and to acquire property and issue its obligations therefor, and by proper and every necessary corporate action, including the unanimous vote of stockholders and directors, at meetings properly convened and held, has duly resolved to issue its first mortgage gold bonds as herein provided, and to execute, acknowledge and deliver this indenture to secure the payment thereof;"

"And whereas, all things necessary have been done to make said bonds, when issued by the company and authenticated by the corporate trustee, the valid, binding and legal obligations of the company and this indenture a valid mortgage lien to secure the payment thereof."

The bonds provided for in the plan were duly issued and delivered, and additional bonds were issued at various times, all being authorized by corporate action. It should be stated that the mortgage, bonds, and notes issued by the Railways Company were prior to issuance authorized by the Public Service Commissions of the states of Missouri and Kansas, and that the plan of reorganization had been approved by the Public Service Commission of Missouri prior to its execution.

At a meeting of the stockholders of the Railways Company early in 1916 and before the bonds were issued a resolution was adopted increasing the authorized capital stock to $30,000,000, but the record thereof was not filed with the secretary of state until November, 1917. The Railways Company operated the properties forming the new system for several years after February, 1916. Interest was regularly paid on the bonds. In 1919 financial difficulties arose. Certain first mortgage bonds fell due and were not paid. The company was unable to pay its general taxes for 1919, and the protective committee, which had been formed, raised and paid some $450,000 for that purpose. There were defaults in the payment of the interest upon the mortgage debt, and in September, 1920, a bill of complaint was filed by the Kansas City Refining Company, a general creditor, asking an equity receivership, and alleging that the Railways Company had outstanding over $27,000,000 of first mortgage bonds, and over $5,000,000 of second mortgage bonds; that it had defaulted in two semiannual installments of interest upon said bonds; that it had $1,000,000 of gold notes secured by pledged bonds due and unpaid; that the lines had been operating at a loss; that there were outstanding current obligations of over $5,000,000, and unsatisfied judgments of $800,000.

The court appointed first a temporary receiver, and then permanent receivers. October 21, 1920, the trustee under the first mortgage, with leave of court, filed an intervening petition and bill to foreclose said mortgage. Certain creditors of the Railways Company holding judgments for personal injury and property damages, called in the proceedings "tort claimants," intervened and raised the question of the validity of the mortgage and bonds under the Missouri Constitution and statutes. The state of Missouri also intervened and filed pleadings to the same effect. These matters were adjusted and the state withdrew from the case.

Appellants' intervening petition attacking the validity of the mortgage and bonds was filed March 6, 1924. The case was tried in 1924, and on December 30, 1924, the court announced its decision. It filed two memorandum opinions. Its final decree upheld the validity of the first mortgage and the first mortgage securities and the various junior lien securities. With reference to the claim of appellants, it said in one of its memorandum opinions:

"The stockholders attack the validity of this entire issue (except possibly $100,000 thereof) upon various grounds. These grounds have been considered, but need not be discussed here, as the court is of the opinion that the stockholders are estopped from challenging the validity of this mortgage or of any of these bonds. Otherwise than this attack by the stockholders, the court understands there is no challenge of the mortgage and no challenge of the bonds ($15,917,400) outstanding in the hands of owners."

And in the other opinion:

"The making of any order of foreclosure is opposed by the stockholders for the reason that said mortgage and bonds are illegal and void. That issue is determined against them for the reasons stated in the memorandum heretofore filed herein. They claim, also, that it would be inequitable to foreclose at this time. This receivership is in its fifth year and receivers have done all that can be done for the property. Practically all claims of every nature have been adjudicated fully and many of them paid. The remaining creditors have been held out of their money, as represented by this property, long enough. No good purpose can be served by prolonging the receivership. It is time to get this property into private hands. There exists in the present situation, no element of unfairness

in permitting these senior lien holders to enforce their rights as such."

It is the claim of appellants (1) that the bonds and mortgage are invalid; that more than $20,000,000 of bonds were issued when the authorized capital stock of the company was only $100,000, and that this was in violation of the statutes of the state of Missouri; (2) that the bonds and notes issued were also invalid, because used to pay the debts of the old companies, or antecedent debts of the new company; (3) that the terms and conditions of sale provided in the final decree were so uncertain that it could not be foreseen what obligations the purchaser would assume in addition to the amount of his bid; (4) that the decree was erroneous and inequitable, in authorizing a foreclosure without some plan of reorganization which would recognize the rights of these beneficial certificate holders and give them opportunity to prevent the loss of all they had in the property by participating in such plan of reorganization. It may be said that the latter question was disposed of contrary to the theory of appellants in New York Trust Co. v. Continental & Com. Trust & Sav. Bank, supra.

Appellees urge that the intervening petition of appellants was properly dismissed, because it evidenced a complete lack of equity, and that appellants were not in position to challenge the validity of the mortgage and bonds. The trial court found that appellants had no standing in a court of equity to contest the validity of the mortgage and the bonds. If the court did not err in this conclusion, then there is no need of discussing other questions raised.

Appellants were stockholders. They received their beneficial certificates by virtue of the reorganization plan. These certificates had no direct part in the creation of the mortgage and bonds, but the stocks in which they represent an interest did. These appellants, therefore, are seeking to nullify a part of the plan of reorganization, to wit, the mortgage and bonds provided for therein, which were authorized by a vote of the very stock in which they claim a beneficial interest.

The court found that these mortgage securities were sold to bona fide holders for value. This contest did not arise until eight years after the issuance of the securities. No question as to these securities was raised until after the settlement of the "tort claimant" matters. The company in whose stock these appellants claim an interest has not offered to restore the properties and money de-

livered in return for the bonds, and appellees insist that on these facts appellants cannot accept the benefits and repudiate the burdens of their contract; that their claims are inequitable and unjust.

Appellants base their claim that the mortgage and bonds issued thereunder are invalid upon section 9740, Rev. Stat. of Mo. 1919, vol. 3, p. 2985, which provides in part as follows:

"The stock or bonds of a corporation shall be issued only for money paid, labor done or money or property actually received. Any corporation may increase its capital stock or its bonded indebtedness with the consent of the persons holding a larger amount in value of the stock, which consent to such increase shall be obtained at a meeting of the shareholders, called for that purpose—sixty days' notice of the time and place of such meeting and of the amount of the proposed increase of stock or bonded indebtedness having been given as hereinafter provided; but the shares of stock or bonds arising from such increase shall only be disposed of for money paid, labor done, or money or property actually received. All fictitious issues or increase of stock or of bonds of any corporation shall be void: Provided, however, that the bonded indebtedness of a corporation shall not be increased so that the entire amount thereof shall exceed the amount of the authorized capital."

In view of two decisions of this court, Grand Valley Water Users' Ass'n v. Zumbrunn, 272 F. 943, and Sioux City Terminal R. & W. Co. v. Trust Co. of N. A., 82 F. 124, if there be no decision of the highest court of Missouri construing such statute otherwise, the same would not be fatal to the validity of the mortgage and bonds. In Grand Valley Water Users' Ass'n v. Zumbrunn, supra, the plaintiff in error borrowed money and then declined to pay the same, upon the ground that the notes and indebtedness represented thereby were illegal, for the reason that the corporation under the laws of Colorado was prohibited from incurring debts to an amount exceeding two-thirds of its capital stock. It was unquestioned that the notes did increase the indebtedness of the corporation far beyond the inhibition of the Colorado statutes. The trial court held the corporation estopped to raise such defense, which decision was affirmed by this court. We quote somewhat extensively from this case (272 F. 947, 948, and 949):

"If the making of this loan and the execution of these notes had been beyond the scope of the power of the corporation, if they had

been acts which the corporation could not have done under any circumstances, or if they had been, as the Supreme Court said, 'outside the object of its creation as defined in the law of its organization, and therefore beyond the powers conferred upon it by the Legislature,' and hence not 'voidable only, but wholly void, and of no legal effect' (Central Transp. Co. v. Pullman's Car Co., 139 U. S. 24, 59, 11 S. Ct. 478, 488, 35 L. Ed. 55), or if there had been any moral turpitude, any delictum, in the transaction, this contention might have prevailed. But this loan was made and these notes were given by the corporation to obtain purchasers and occupants of lands in its district who would take and use the water of the canal which it was organized to promote, purchase, and operate, and become renters of these waters and owners of its stock to the respective amounts of one share for each acre of land so held by them. The transaction was made to accomplish the chief object for which the defendant's articles declared that it was organized. Under these articles and under the laws of Colorado it had the general corporate power to borrow money and to make its promissory notes therefor to accomplish this main object. So it was that the transaction was far within the scope of the general powers of the corporation, and it was had to accomplish the main object of its organization, and it did not fall under the ban of decisions which counsel cite, like Central Transportation Co. v. Pullman Palace Car Co., supra, where the transaction was one which the corporation could not under any circumstances make. This transaction was not an act beyond the scope of the powers granted to the corporation, but was the mere excessive exercise of one of the powers expressly conferred upon it, and there was no turpitude in it, there was neither malum in se nor malum prohibitum, and hence no delictum in the act in which the plaintiff participated. * * *

"If, in this state of the case, the indebtedness of the defendant was increased by its borrowing of this money above the limit prescribed by its articles and the statute of Colorado, there are two reasons why the plaintiff may not defeat this action on that ground. The first is that no statute of Colorado denounced the penalty of the invalidity of a contract which increased the indebtedness of a corporation beyond the limit prescribed for it by the statutes or its articles, and where the Legislature of a state under which a corporation is organized imposes no such penalty for exceeding the limit of its indebtedness, a court may not do so.

"The second is that, where a corporation acting within the scope of its general powers borrows, receives the benefits of, and promises to repay moneys which the lender pays over to it, or to its order, that promise is voidable, and not void; it is valid until avoided, not void until validated, notwithstanding the fact that it may increase its indebtedness above the limit therefor prescribed by statute or by its articles, and an action upon the promise is maintainable, even though the lender knew when he made the loan that it increased the corporation's indebtedness above such limit. It is not denied that a court of equity might avoid such a promise at the suit of the corporation before it received the money for it, or after such receipt on condition that it first repaid the money. But, after such a contract is executed, after the promisor has received and used the money and retains it, its promise is actionable."

It is to be noted that the Missouri statute does not in terms invalidate bonds issued in excess of the authorized capital stock of a corporation, and it should be further noted that the Railways Company was acting within the scope of its general powers in issuing the bonds and in making the mortgage. Rev. Stat. of Mo. 1909, art. 5, c. 33, defines the powers, rights, and duties of street railways, and section 3316 authorizes such companies "to purchase, lease or acquire * * * and to hold, use and operate any street railroad or roads, * * * to issue bonds payable in such amount and at such times * * * as it deems best, and may dispose of the same for the purposes of its incorporation, and to secure payment of the same, may mortgage its property, real and personal, and also the franchises of the company."

The Railways Company was acting within the scope of its general powers in issuing these bonds, but it went beyond the limitation of the statute and, as in the Zumbrunn Case, there was excessive exercise of its powers, but, as held by this court in that case, in relation to the Colorado statute, the indebtedness was not invalidated by such excessive exercise of power.

In Sioux City Terminal R. & W. Co. v. Trust Co. of N. A., supra, the same questions were considered by this court. The terminal company, an Iowa corporation, had an authorized capital stock of a million dollars. Under the Iowa law it was prohibited from incurring indebtedness in excess of two-thirds

of its capital stock. It incurred a debt far in excess of that amount, delivering a mortgage upon its property to a trust company and issuing $1,250,000 of mortgage bonds. The mortgage was foreclosed. The terminal company and its creditors appealed from the decree, claiming that the mortgage and bonds, having been issued in violation of the statutory provisions, were void. The case is very similar to the case at bar. This court sustained the decree of foreclosure. In discussing the question raised, as to the invalidity of the mortgage because the debt was in excess of the amount which the terminal company had a right to contract, it pointed out that the articles of incorporation gave no authority to incur the indebtedness in excess of $666,667, and that the debt was clearly in excess of the statutory limitation, and there was a plain violation of the statute. After referring to the proper recording of the mortgage and the application of the proceeds of the bonds by the mortgagor to the payment of its debts, and to the purchase and improvement of its property, the court said:

"Neither the bondholders nor the trust company were guilty of any fraud or bad faith in the transaction. The debt was not created, nor was the mortgage made or accepted, with any intent to defraud any of the existing or subsequent creditors of the corporation. Can the mortgagor, under these circumstances, avail itself of its violation of the statute to defeat the mortgage upon which it has borrowed this money? If not, have its subsequent creditors any better standing to assail it? These are the crucial questions in this case. This is a suit in equity. The terminal company has received the full benefit of the proceeds of these bonds, and it obtained this money upon the faith of this mortgage. The creation of the debt and mortgage was not without the general scope of its powers, but it was the result of an excessive exercise of one of those powers. The corporation had, as we have seen, the general power to borrow money, and to secure its repayment by a mortgage. If the aggregate amount of the bonds secured by this mortgage had been $650,000, instead of $1,250,000, they would have been valid, in the absence of other indebtedness."

The court also distinguished various cases, many of which are here cited by appellants, such as Central Transp. Co. v. Pullman's Palace Car Co., 139 U. S. 24, 11 S. Ct. 478, 35 L. Ed. 55, and said:

"The statute, whose provisions the bonds and mortgage violate, prescribed no penalty for such a violation. It did not declare that bonds and mortgages issued to secure an indebtedness in excess of the limitation it fixed should be void. Since the Legislature imposed no such penalty, it is not the province of the courts to do so. The remedy for the violation of this statute is not the destruction of the contracts which evidence it, but the ouster and dissolution of the corporation at the suit of the state. The state alone can complain of it, and the debtor cannot usurp its functions."

This case seems to cover very clearly the questions here involved.

It does not seem to be contested here that, if the resolution adopted by the stockholders which increased the authorization of stock had been filed with the secretary of state, there would have been legal authority to have issued the bonds now questioned. This resolution was adopted prior to the execution of the mortgage. While the bondholders may have had responsibility upon them to see that it was filed, as provided by law, the corporation likewise had some responsibility in the premises, and they carelessly, or for some purpose which is not revealed in the record, failed to comply with the provisions of the law. Appellants now assert this failure to observe the law for which the corporation (the stock in which they claim to have an interest) was partially responsible, as sufficient to invalidate the mortgage securities. In the Sioux City Terminal Case, supra, this court had something to say concerning such a situation.

It is settled that an act of a corporation clearly and entirely beyond the corporate powers is void, as outside the object of the corporation's creation, and cannot be confirmed or ratified, or be made lawful and binding by an estoppel, so as to sustain an action thereon. The rule is stated by the Supreme Court in Union Pacific Ry. Co. v. Chicago, etc., Ry. Co., 163 U. S. 564, 581, 16 S. Ct. 1173, 1180 (41 L. Ed. 265), as follows: "A contract made by a corporation beyond the scope of its powers, express or implied, on a proper construction of its charter, cannot be enforced, or rendered enforceable by the application of the doctrine of estoppel." In the much-cited case of Central Transp. Co. v. Pullman's Car Co., 139 U. S. 24, 60, 11 S. Ct. 478, 488 (35 L. Ed. 55), it is said: "When a corporation is acting within the general scope of the powers conferred upon it by the Legislature, the corporation, as well as persons contracting with it, may be estopped to deny that it has complied with the legal formalities which are prerequisites to

its existence or to its action, because such requisites might in fact have been complied with. But when the contract is beyond the powers conferred upon it by existing laws, neither the corporation, nor the other party to the contract, can be estopped, by assenting to it, or by acting upon it, to show that it was prohibited by those laws." Pennsylvania R. Co. v. St. Louis, Alton, etc., Railroad, 118 U. S. 290, 6 S. Ct. 1094, 30 L. Ed. 83; McCormick v. Market Bank, 165 U. S. 538, 17 S. Ct. 433, 41 L. Ed. 817; California Bank v. Kennedy, 167 U. S. 362, 17 S. Ct. 831, 42 L. Ed. 198; Sioux City Terminal R. R. & Warehouse Co. v. Trust Co., 173 U. S. 99, 19 S. Ct. 341, 43 L. Ed. 628; De La Vergne Co. v. German Savings Inst., 175 U. S. 40, 20 S. Ct. 20, 44 L. Ed. 65; First National Bank v. Converse, 200 U. S. 425, 26 S. Ct. 306, 50 L. Ed. 537.

In Jones v. Guaranty & Indemnity Co., 101 U. S. 622, 628, 25 L. Ed. 1030, where it was alleged that a mortgage and bond issue were illegal and ultra vires, the court held that the corporation and its stockholders could not raise the question, saying: "Where money had been obtained by a corporation upon its securities, which were irregular and ultra vires, but the money was applied for the benefit of the company, with the knowledge and acquiescence of the shareholders, the company and the shareholders were estopped from denying the liability of the company to repay it. And the same result follows where such securities are issued with the knowledge of the shareholders, so far as the money thus raised is applied for the benefit of the company."

■ The line of demarcation in the various cases is clear. Where the acts complained of are entirely beyond the scope of the power of the corporation, and are void and of no legal effect, then the corporation or its stockholders are not estopped to question such acts; but if the acts are done within the scope of the general powers, and are an excessive exercise of such powers, the corporation and the stockholders may be estopped, where the corporation has received money or property thereby and devoted it to the general purposes of the corporation. The Missouri statute, as we have pointed out, does not in terms make the penalty for a violation thereof the invalidity of bonds issued in excess of the authorized capital, but counsel for appellants contend that the Missouri Supreme Court has so held in construing that statute. The case relied on is Hess Warming & Ventilating Co. v. Burlington Grain Elevator Co. et al., 280 Mo. 163, 217 S. W. 493.

■ We would be bound by the settled construction of the laws of Missouri by the highest judicial tribunal of the state, where no question of general or commercial law or of right under the Constitution of the United States was involved. Sioux City Terminal R. & W. Co. v. Trust Co. (C. C. A.) 82 F. 124; Mudge v. Black, Sheridan & Wilson (C. C. A.) 224 F. 919; Mississippi Valley Trust Co. v. Railway Steel S. Co. (C. C. A.) 258 F. 346; Sioux City R. R. Co. v. N. A. Trust Co., 173 U. S. 99, 19 S. Ct. 341, 43 L. Ed. 628.

Does the Hess Warming & Ventilating Company Case, supra, settle the question that all bonds issued in the state of Missouri in excess of the capital stock of a corporation are under all circumstances absolutely void? It is to be noted in that case that the proceedings were attacked by a bona fide creditor—not a stockholder. It is to be observed, also, that the court took occasion to point out that no rights of innocent purchasers were involved, saying (280 Mo. 192, 217 S. W. 502): "We may say in passing, after a careful perusal of the record in this case, that there are no rights of innocent purchasers involved, as all the parties engaged in these transactions were fully aware of all the facts which rendered the same illegal. Not a dollar was paid on the alleged increase, no stock was ever issued or delivered, no bonds were ever sold, or otherwise disposed of, except those which passed into the hands of the bank illegally, as hereafter shown."

These words are significant. The Hess Case was a flagrant one. False articles were filed with the state authorities, certifying that the capital stock had been duly increased. Bonds were issued to the amount of the fraudulent increase of stock. The stock increase was fraudulent and fictitious. There was an all-around general fraudulent scheme, and apparently there were no innocent parties concerned in it. None of the increased stock had ever been issued or paid for. Parties to the conspiracy had taken the bonds with full notice of the fraud. The entire assets of the elevator company were appropriated by the conspirators. The situation is not the same as here, where the court has found that the holders of the bonds are innocent and bona fide holders for value. The Hess Case must be considered in view of the facts thereof. It does not lay down a general principle that, if bonds in excess of the authorized capital stock had been sold to bona fide purchasers for value, they would be absolutely void under the Missouri law. It was not a case where, before the bonds had

been issued, there had been a good-faith attempt to authorize an increase in the capital stock, which would have been sufficient to cover the amount of the bonds, had all legal requisites been complied with. The court in that case is careful to point out that no innocent parties were involved, which would seem to indicate that, if bonds had been issued to innocent parties, the decision would have been otherwise. In any event that question has not been determined by the Supreme Court of Missouri. We do not think the decision in the Hess Case applied to the facts there disclosed is such a construction of the Missouri statute as to compel us to hold under the facts of this case that the mortgage securities here involved are absolutely void.

There is another principle announced by this court in Sioux City Terminal Co. v. Trust Co., supra, separate and distinct from the question of estoppel, and that is the equitable one, that he who seeks equity must do equity, and that one may not accept the benefits and repudiate the burdens of his contract. These bonds were issued to bona fide holders, partly in payment for the properties sold under the mortgage foreclosure and partly for cash. The property was secured by the Railways Company by virtue of their issuance. There has been no offer to return the moneys advanced on the faith of the bonds and mortgage. The Railways Company could not under these circumstances have retained the property and the money received, and repudiated the bonds, and what the Railways Company cannot do its stockholders, or those having an interest therein, would have no right to do.

We quote on this subject from Sioux City Terminal Co. v. Trust Co., 82 F. 134: "The corporation does not offer to return the moneys which it received upon this mortgage, but seeks to retain all its benefits and to repudiate all its burdens. It will be soon enough for the chancellor to stay his hands from the enforcement of these contracts, and soon enough for him to set them aside, when the corporation returns to the complainant the moneys it received upon them. Until then, good faith, justice, and equity demand their enforcement. A man cannot plead his own wrong to relieve himself from the obligations of an executed contract whose benefits he retains; nor is it any defense for a private corporation, against the enforcement of an executed contract whose benefits it holds, that, while its execution was within the general scope of its powers, it involved an excessive exercise of one of them. While it retains the benefits of such a contract, it silently affirms, and may not be permitted to deny, its validity. * * * Nor is the innocence or ignorance of the creditor essential to the maintenance of his suit to enforce such a contract. * * * These decisions do not rest upon the principle of estoppel, nor depend upon the creditors' ignorance of the excessive indebtedness. They stand upon the rule that he who seeks equity must do equity, and upon the principle that one may not at the same time accept the benefits and repudiate the burdens of his contracts."

We are satisfied the conclusion of the trial court that these appellants were without standing in a court of equity was correct. We therefore proceed no further, and affirm the judgment and decree.

Affirmed.