## CHASE NAT. BANK OF CITY OF NEW YORK v. WABASH RY. CO. et al.
### No. 12099.

District Court, E. D. Missouri, E. D.

Aug. 25, 1941.

N. S. Brown, of St. Louis, Mo., for receivers of Wabash Ry. Co. and another.

Homer Hall and J. S. Fathman, both of St. Louis, Mo., for Wabash Ry. Co.

Hennings, Green, Henry & Evans and Robert D. Evans, all of St. Louis, Mo., and Russell L. Snodgrass and Louis J. Morman, Jr., both of Washington, D. C., for Reconstruction Finance Corporation.

Nagel, Kirby, Orrick & Shepley and Allen C. Orrick, all of St. Louis, Mo., and Milbank, Tweed & Hope and Arthur A. Gammell, all of New York City, for Chase Nat. Bank of City of New York.

Larkin, Rathbone & Perry and Hovey C. Clark, all of New York City, for Central Hanover Bank & Trust Co.

Thompson, Mitchell, Thompson & Young and Guy A. Thompson, all of St. Louis, Mo., and Humes, Buck, Smith & Stowell and Irwin L. Tappen, all of New York City, for New York Trust Co.

Taylor, Chasnoff & Willson and Jacob Chasnoff, all of St. Louis, Mo., and Chadbourne, Hunt, Jaeckel & Brown and Alfred H. Phillips, all of New York City, for Chemical Bank & Trust Co.

Anderson, Gilbert, Wolfort, Allen & Bierman and Roscoe Anderson, all of St. Louis, Mo., and Dunnington, Bartholow & Miller and William H. Radebaugh, all of New York City, for Central Hanover Bank & Trust Co. and others.

Polk & Williams and Charles P. Williams, all of St. Louis, Mo., and Carter,

Ledyard & Milburn and John P. Allee, all of New York City, for Manufacturers Trust Co.

Fordyce, White, Mayne, Williams & Hartman, Thomas W. White and G. Carroll Stribling, all of St. Louis, Mo., and Winthrop, Stimson, Putnam & Roberts and Eduardo Andrade, all of New York City, for group of insurance companies.

Bryan, Williams, Cave & McPheeters and Crawford Johnson, all of St. Louis, Mo., and Root, Clark, Buckner & Ballantine and William P. Palmer, all of New York City, for Protective Group for Wabash Ry. Co. Refunding and General Mortgage Bonds.

Simpson, Thacher & Bartlett and Hamilton C. Rickaby, all of New York City, for Stockholders Protective Committee.

DAVIS, District Judge.

On December 1, 1931, the T. J. Moss Tie Company filed in this Court its bill of complaint against Wabash Railway Company alleging insolvency and praying for the administration of its properties as a trust estate for the benefit of its creditors. The defendant Railway Company appeared by counsel and filed its answer admitting the allegations of the bill of complaint and consenting to the appointment of receivers. This Court assumed jurisdiction of the proceeding and appointed receivers on authority of the decision of the Supreme Court of the United States in Re Metropolitan Railway Receivership (In re Reisenberg), 208 U.S. 90, 28 S.Ct. 219, 52 L. Ed. 403. Later, the same receivers were appointed by various District Courts exercising ancillary jurisdiction. Important parts of the railways and property of the defendant Railway Company and its principal operating offices are situated in this District but other parts extend to or are located in other Circuits and in other Districts within this Circuit. The principal termini of the railway, other than St. Louis, are Buffalo, Detroit and Toledo on the east and Kansas City, Chicago, Des Moines and Omaha on the west, and ancillary proceedings are pending at these cities and elsewhere.

At the time of the filing of the general creditor's bill of complaint of the T. J. Moss Tie Company an interest default was imminent upon an issue of bonds of the defendant Railway Company in the principal amount of $60,867,000, secured by a mortgage or deed of trust known as its refunding and general mortgage dated January 1, 1925, under which the Chase National Bank of the City of New York is the trustee. Such a default occurred on February 1, 1932, and upon each subsequent interest due date, and these defaults continue.[1]

In the early period of the receivership, before there was a realization of the full impact of the depression which set in in 1930, it was assumed that a reorganization ultimately could be brought about by a foreclosure and sale under the refunding and general mortgage without disturbing the liens of other mortgages of prior rank— these mortgages in most instances securing bonds of the predecessor, the Wabash Railroad Company, which had remained undisturbed in and had survived the reorganization of the last named company in 1915. To aid the receivers to maintain this policy by averting defaults under senior mortgages or other paramount liens funds were advanced to the receivers by Reconstruction Finance Corporation, with the prior approval of the Interstate Commerce Commission. These loans, together with other subsequent loans for capital purposes, are represented by receivers' certificates of indebtedness outstanding in the amount of $20,885,994, all of which are held by Reconstruction Finance Corporation except $4,491,411, designated as series B, held by a group of banks.[2]

Early in 1937, the receivers applied for authority to pay as theretofore the interest about to fall due upon certain of the bonds secured by senior mortgages and although payment of such interest could be justified by current earnings it had become apparent that a more drastic reorganization than

---

[1] The history of the creation and issue of these bonds is shown in the following reports of the Interstate Commerce Commission under title, Bonds of Wabash Railway Company, 94 I.C.C. 648; 111 I.C.C. 786; 131 I.C.C. 597; 138 I.C.C. 501; 138 I.C.C. 774; 145 I.C.C. 637; 162 I.C.C. 609.

[2] The history of the creation and issue of these receivers' certificates and details respecting the liens thereof are shown in the following reports of the Interstate Commerce Commission under title, Wabash Railway Company Receivers Reconstruction Loan, 180 I.C.C. 467; 184 I.C.C. 453; 187 I.C.C. 195; 187 I. C.C. 519; 189 I.C.C. 124; 193 I.C.C. 15; 199 I.C.C. 379; 202 I.C.C. 690.

was originally contemplated would be necessary. The Court being of this opinion, and also of the opinion that the proceedings for reorganization should be set in motion, denied the authority asked by the receivers and directed the security holders, through their representatives, to formulate and file a plan of reorganization within a specified period and, in the event of a failure of the security holders to develop and file a plan, directing the receivers, as representatives of the Court to assume that responsibility in accordance with the precedent established by District Judge Mayer in the matter of the reorganization of Graselli Chemical Co. v. Aetna Explosives Company, 2 Cir., 1918, 252 F. 456.[3]

The security holders having failed to act under the Court's order, a plan was ultimately filed by the receivers but progress was halted by the new depression which set in late in 1937 and continued through 1938. To meet changed conditions the plan was withdrawn for revision and early in 1940 a new plan was filed in this Court and finally, after further revision, was placed before the Interstate Commerce Commission as the basis for necessary authorizations under various sections of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., and Reconstruction Finance Corporation Act, 15 U.S.C.A. § 601 et seq. There were hearings upon these requested authorizations on December 16 and 17, 1940, and an adjournment taken to make possible an adjustment of certain unreconciled differences still existing between the major interests.

On March 17, 1941, the receivers submitted to this Court a revised plan of reorganization which, it was represented to the Court, eliminated all differences which theretofore existed between major interests. Under order of this Court dated March 17, 1941, this revised plan of reorganization was received and filed and the receivers were directed to proceed with all reasonable dispatch to cause appropriate application to be made to the Interstate Commerce Commission by Wabash Railroad Company, incorporated September 2, 1937, under the laws of Ohio as a necessary and proper corporate entity to become successor in reorganization of Wabash Railway Company, to amend its application then pending in the Interstate Commerce Commission by substituting for the plan then under consideration by the Commission (the plan upon which hearings had been held on December 16 and 17, 1940) the revised plan dated as of March 15, 1941. The order of the Court dated March 17, 1941, also provided as follows:

"Any party to this cause, and each of the trustees under the mortgages or trust agreements securing obligations embraced in said substitute or revised Plan, Reconstruction Finance Corporation, and each holder of Receivers' Certificates of Indebtedness, Series B, and each of the Groups and the Protective Committee, representing respectively Underlying and Divisional Mortgage Bonds, Refunding and General Mortgage Bonds, and Preferred and Common Stock, hereinbefore described, shall have the right on or before April 17, 1941, to file its, his or their claims for other or different treatment, if any they may have, but without permission to intervene unless given pursuant to a motion under Rule 24 of the Rules of Civil Procedure [28 U.S.C.A. following section 723c], to the holders of any of the bonds, obligations or other securities of Wabash Railway Company, or any of its predecessors embraced in the said Plan, the Court hereby reserving full jurisdiction to hear and determine any objections to said substitute or revised Plan, or any modifications thereof, or any part thereof, either before or after the submission of said substitute or revised Plan to the Interstate Commerce Commission."

By this order of March 17, 1941, it was further provided "This cause is set for further hearing before this Court on April 24, 1941, at ten o'clock in the forenoon, in the United States Courtroom in the United States Court House, City of St. Louis, State of Missouri, to hear and consider any claims filed herein for other or different treatment from that provided for in said Plan of Reorganization and upon any and all questions arising in connection therewith and the Receivers are hereby directed to deliver or forward by United States mail copies of this order to the parties of record herein and to publish notice of said hearing (at least two weeks in ad-

---

[3] The background of this decision and an analysis of the three separate opinions of the Circuit Judges in the Second Circuit, appear in an article entitled "The Ætna Explosives Company Case, a Milestone in Reorganization" in 20 Columbia Law Review 733.

vance thereof) in newspapers of general circulation in the Cities of New York, N. Y., Detroit, Michigan, Chicago, Illinois, St. Louis and Kansas City, Missouri, and Fort Wayne, Indiana."

Notice of the hearing was published as required by the order and in addition to the formal requirement of the order the receivers mailed post-card notices of the filing of the revised plan, and the opportunity to all parties in interest to suggest other or different treatment than that accorded in the plan, to every known bondholder, creditor and stockholder—the proof indicating that more than 13,000 of these notices were mailed to these parties in interest.

Wabash Railroad Company, the corporation of Ohio to which reference already has been made and which was the applicant in the proceedings pending before the Interstate Commerce Commission, promptly filed with the Interstate Commerce Commission, as directed by this Court's order of March 17, 1941, the revised plan dated as of March 15, 1941, with appropriate amendments in the pending application to secure the authority necessary for its consummation, including specifically authority under Section 5 of the Interstate Commerce Act to acquire at foreclosure sale or sales and to operate all the railroads (including all the lines of railroad operated under contract, lease or agreement), properties and assets of Wabash Railway Company; authority under Section 5 of the Interstate Commerce Act for approval and authorization of the acquisition of control of other common carriers now embraced in the Wabash System through stock purchase; authority under Section 20a of the Interstate Commerce Act to create and issue the securities and assume the obligations and liabilities contemplated by the plan with respect to the obligations of others, and authority under Section 5b, Paragraph (3) of the Reconstruction Finance Corporation Act for approval of the proposed compromise and adjustment by Reconstruction Finance Corporation of its claims against Wabash Railway Company and the receivers thereof which are evidenced by certificates of indebtedness of the receivers held by Reconstruction Finance Corporation. A complementary application was later filed by the Pennsylvania Railroad Company and the Pennsylvania Company under Section 5(2) of the Interstate Commerce Act for authority to acquire control of Wabash Railroad Company by stock ownership in accordance with the plan.

On July 29, 1941, after further hearings, the Interstate Commerce Commission approved all of the authorizations requested by Wabash Railroad Company and the Pennsylvania Railroad Company and Pennsylvania Company.[4]

The full administrative authority of the Interstate Commerce Commission having been exercised in favor of the consummation of the plan of reorganization of March 15, 1941, the cause is ripe for such approval or authorization on the part of the Court as may be granted in the exercise of its broad, comprehensive jurisdiction over corporate reorganizations to be carried out by the use of the machinery of foreclosure and sale which is provided by equity.[5]

---

[4] The reports of the Interstate Commerce Commission upon the application of Wabash Railroad Company are in Finance Docket No. 13010 and 130101; its report upon the application of the Pennsylvania Railroad Company and the Pennsylvania Company is in Finance Docket No. 13235; and all are dated July 29, 1941; they have been filed in this court and made a part of the record in this cause. These reports are comprehensive in their. description of the properties of the applicants, the earnings' experience of and other statistical data pertaining to the railways and properties that are to be acquired by Wabash Railroad Company, as successor in reorganization, and all matters pertaining to the public interest. The availability of this wealth of material makes possible an abbreviation of what otherwise would be a necessary factual background for this opinion.

[5] Bills of foreclosure have been filed or are in process by the trustee or trustees under the first mortgage of the Wabash Railroad Company dated May 1, 1889, under which Central Hanover Bank and Trust Company is trustee; the second mortgage of the Wabash Railroad Company dated February 1, 1889, under which Manufacturers Trust Company is trustee; the debenture mortgage of the Wabash Railroad Company dated July 1, 1889, under which Bankers Trust Company is trustee; the Detroit and Chicago extension first mortgage of the Wabash Railroad Company dated July 1, 1891, under which Central Hanover Bank and Trust Company is trustee; the Des

This jurisdiction, which is now recognized as extending to every detail of a reorganization proposal in its relation to the property rights of senior as well as junior or unsecured creditors, is traceable to the early case of Chicago, R. I. & P. Railroad Company v. Howard, 1868, 7 Wall. 392, 19 L.Ed. 117, and to the subsequent cases of Louisville Trust Company v. Louisville Railroad Company, 1898, 174 U.S. 674, 19 S.Ct. 827, 43 L.Ed. 1130 and Northern Pacific Railway Company v. Boyd, 1912, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931. In the case of Guaranty Trust Company v. Missouri Pacific Railway Company, D.C., 1916, 238 F. 812, Circuit Judge Hook held that the Court must take cognizance of the entire plan of reorganization and act accordingly. In the course of his opinion, Judge Hook said (238 F. at page 816):

"The conclusion is manifest that the general duty of a court in a railroad foreclosure suit to take cognizance of a plan of reorganization by the bondholders and stockholders which is to be aided by its decree, and to protect the equitable rights of all, becomes specific and imperative upon the complaint of an interested party."

The decree entered by Circuit Judge Hook was affirmed in all of its parts by the unanimous opinion of the Circuit Court of Appeals, consisting of Judges Sanborn, Lewis and Van Valkenburgh in P. R. Walsh Tie & Timber Co. v. Missouri Pacific Railway Company, 8 Cir., 1922, 280 F. 38. A review of the subsequent decisions is unnecessary. The more important ones are cited below.[6] It may be noted, however, that the Circuit Court of Appeals for the Second Circuit in Graselli Chemical Company v. Ætna Explosives Company, already mentioned, supported fully Circuit Judge Hook's conclusion as above stated that a determination of the fairness of a plan in all of its aspects is a part of the equity power of the District Court. The requirement of subsection e of Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, sub. e, and Section 221 of the Chandler Act, 11 U.S.C.A. § 621, that no plan of reorganization shall be confirmed until judicially determined to be fair and equitable is merely declaratory of the rule already existing in equity.

At the hearing held by the Court on April 24, 1941, the primary objective was a judicial determination that the plan of reorganization dated as of March 15, 1941, made fair and equitable provision for bondholders and creditors and all persons having an interest in the trust estate and otherwise complied with the law of the land; and the evidence was developed with specific reference to the decision of the Supreme Court of the United States in Case v. Los Angeles Lumber Products Company, 1939, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110, and Consolidated Rock Products Company v. Du Bois, 1941, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982, which, for convenience, will hereinafter be referred to as the Los Angeles Lumber Products case and the Consolidated Rock Products case, respectively.

Only in a procedural sense is the plan of March 15, 1941, a plan of the receivers; it is the evolution of negotiations extending

Moines Division first mortgage of the Wabash Railroad Company dated January 1, 1899, under which the New York Trust Company is trustee; the Toledo and Chicago Division first mortgage of the Wabash Railroad Company dated June 1, 1901, under which Irving Trust Company is trustee; the Omaha Division first mortgage of the Wabash Railroad Company dated October 12, 1901, under which the New York Trust Company is trustee; the first mortgage of the Columbia and St. Louis Railroad Company dated May 1, 1902, under which Mississippi Valley Trust Company is trustee; the first terminal trust agreement of the Wabash Railroad Company dated January 1, 1904, under which Chemical Bank & Trust Company is trustee; and the refunding and general mortgage of Wabash Railway Company dated January 1, 1925, under which the Chase National Bank of the City of New York is trustee. All of these proceedings were commenced under authority of an order of this Court as the Court of primary jurisdiction.

[6] St. Louis-San Francisco Railway Company v. McElvain, D.C.1918, 253 F. 123; Phipps v. Chicago, Rock Island & Pacific Railway Company, 8 Cir., 1922, 284 F. 945, 28 A.L.R. 1184; Kansas City Terminal Railway Company v. Central Union Trust Company of New York, 1926, 271 U.S. 445, 46 S.Ct. 549, 70 L. Ed. 1028; Id., 8 Cir., 1928, 28 F.2d 177; Guaranty Trust Company of New York v. Chicago, Milwaukee & St. Paul Railway Company, D.C.1926, 15 F.2d 443; Warner Brothers Pictures, Inc. v. Lawton-Byrne-Bruner Ins. A. Co., 8 Cir., 1935, 79 F.2d 804.

over a period of at least four years in which representatives of all classes of security holders, including mortgage trustee, were active participants.[7] The receivers prepared many studies and at all times made their facilities available to the parties and otherwise aided in the negotiations, but insofar as it was possible to do so they maintained a neutral position; they also, in compliance with orders of the Court, set up the essential reorganization machinery.

The plan of March 15, 1941, is to be made effective as of January 1, 1941, and the capital structure of the defendant Railway Company as of that date, including obligations created by the receivers which must be assumed or discharged, may be summarized as follows:

## WABASH RAILWAY COMPANY
### SUMMARY OF CAPITAL STRUCTURE
January 1, 1941.

| Name of Security | Principal | Interest | Total Debt as of Jan. 1, 1941 |
|---|---|---|---|
| The Wabash Railroad Company: | | | |
| First Mortgage 5% Bonds | $ 33,891,000 | $ 5,366,075 | $ 39,257,075 |
| Detroit and Chicago Extension First Mortgage 5% Bonds | 1,844,000 | 276,600 | 2,120,600 |
| Toledo and Chicago Division First Mortgage 4% Bonds | 3,000,000 | 340,000 | 3,340,000 |
| First Lien Terminal 4% Bonds | 3,555,000 | 355,500 | 3,910,500 |
| Des Moines Division First Mortgage 4% Bonds | 1,600,000 | 204,800 | 1,804,800 |
| Omaha Division First Mortgage 3½% Bonds | 3,160,500 | 370,569 | 3,531,069 |
| Second Mortgage 5% Bonds | 13,993,000 | 2,740,296 | 16,733,296 |
| Debenture Mortgage 6% Series B Bonds, and Scrip | 200,326 | 47,760 | 248,086 |
| The Columbia and St. Louis Railroad Company: | | | |
| First Mortgage 4% Bonds | 200,000 | 26,933 | 226,933 |
| Wabash-St. Charles Bridge Company: | | | |
| First Mortgage 4% Serial Bonds | 2,025,000 | ........ | 2,025,000 |
| Wabash-Hannibal Bridge Company: | | | |
| First Mortgage 3½% Serial Notes | 50,000 | ........ | 50,000 |
| Wabash Railway Company: | | | |
| Equipment Trust 2½% Certificates, Series H | 8,540,000 | ........ | 8,540,000 |
| Receivers' Certificates | 20,885,994 | 1,008,923 | 21,894,917 |
| Refunding and General Mortgage 4½%–5½% Bonds | 60,867,000 | 28,089,222 | 88,956,222 |
| | $153,811,820 | $38,826,678 | $192,638,498 |
| Preferred Stock A | | | 69,830,850 |
| Preferred Stock B | | | 1,087,742 |
| Common Stock | | | 67,202,175 |
| Total Capitalization | | | $330,759,265 |

[7] Those from time to time participating in the negotiations included a group of insurance companies representing underlying and divisional mortgage bonds; a group of insurance companies representing refunding and general mortgage bonds; a Stockholders Protective Committee, each represented by separate counsel and aided by technical and statistical experts from the respective staffs; various mortgage trustees; Reconstruction Finance Corporation and direct representatives of the principal stockholding interests.

■■ There were two factors over which the parties in the development of a plan of reorganization could exercise no control; they could not definitely predetermine the total amount of capitalization nor the total amount of fixed interest bearing debt— these subjects being committed by Congress to the Interstate Commerce Commission. They proceeded, however, upon an assumption, based on an informed judgment, that the Interstate Commerce Commission would not approve new fixed interest bearing debt (exclusive of existing debt to be assumed) in excess of $47,354,241 or a total capitalization in excess of $192,647,795.[8] The first problem was to determine the proper distribution or allocation of $47,354,241 of new first mortgage bonds among various senior lien creditors of the defendant Railway Company. Included, however, in the defendant Railway Company's capital structure are seven separate issues of first mortgage bonds (sometimes referred to as the underlying bonds), each secured by a mortgage (sometimes collectively referred to as the underlying mortgages) constituting a first and paramount lien upon some part of the system railways or property, representing as of January 1, 1941, (including accrued but unpaid interest entitled under the case of Consolidated Rock Products Company v. Du Bois, supra, equality of treatment with the principal) an aggregate indebtedness of $54,190,977. At once it will be noted that provision could not be made for the issue or allocation of new first mortgage bonds limited to $47,354,241 to each of these seven issues of first mortgage bonds of the defendant Railway Company. But the problem was made yet more difficult by the assertion of a claim by Reconstruction Finance Corporation that the receivers' certificates held by it, aggregating with accrued interest to January 1, 1941, $17,328,404, constituted a first and paramount lien on all equipment acquired since 1915 or the equity therein after deducting the amount of the outstanding equipment obligations and in addition a like lien upon many other important items of property pledged under the refunding and general mortgage of the defendant Railway Company. No reorganization was feasible in this situation unless some part of the existing first mortgage debt could be adjusted through the

issue on equitable terms of a subordinate security. The necessity of such an adjustment was recognized in Mr. Justice Douglas' opinion for the Supreme Court of the United States in Consolidated Rock Products case [312 U.S. 510, 61 S.Ct. 687, 85 L.Ed. 982], when it is stated:

"Certainly where unified operations of separate properties are deemed advisable and essential, as they were in this case, the elimination of divisional mortgages may be necessary as well as wise. Moreover, the substitution of a simple, conservative capital structure for a highly complicated one may be a primary requirement of any reorganization plan. There is no necessity to construct the new capital structure on the framework of the old."

■ As preliminary to any allocation of new fixed interest bearing bonds among senior lien claimants of the defendant Railway Company, it was necessary to determine the lien position of the receivers' certificates held by Reconstruction Finance Corporation because, as stated by Mr. Justice Douglas in the same opinion: "* * * there must be a determination of what assets are subject to the payment of the respective claims." Only two ways were open for a determination of what assets were subject to the payment of the receivers' certificates: (a) Long, tedious and costly litigation or (b) an adjustment or compromise on fair terms after full disclosure of essential factors and notice to the interested parties. The latter course was pursued by the parties on authority of the decision of the Supreme Court of the United States in the Los Angeles Lumber Products case [308 U.S. 106, 60 S.Ct. 14, 84 L.Ed. 110], where Mr. Justice Douglas in the Court's opinion said:

"Close questions of interpretations of after-acquired property clauses in mortgages, preferences in stock certificates, divisional mortgages and the like will give rise to honest doubts as to which security holders have first claim to certain assets. Settlement of such conflicting claims to the res in the possession of the court is a normal part of the process of reorganization. In sanctioning such settlements the court is not bowing to nuisance claims; it is administering the proceedings in an economical and practical manner."

---

8 The difference between total present debt, $192,638,498, and total new capitalization, $192,647,795, reflects cash payments under the plan and a reservation of 19,970 shares of common stock for miscellaneous claims.

Specifically, the claim asserted by Reconstruction Finance Corporation was that by the terms of the orders of the Court defining the lien of receivers' certificates issued to and held by it in the principal amount of $17,328,404, they constitute a first lien upon all property and assets subject to the refunding and general mortgage as a first lien thereon and that this embraced equipment acquired by the defendant Railway Company subsequent to November 1, 1915, and having a book value fully depreciated to December 31, 1940, of $31,367,517.05, no part of which had fallen under the after-acquired property clauses of underlying mortgages. This claim was chiefly based upon the decision of the Circuit Court of Appeals in this Circuit in Mississippi Valley Trust Company v. Southern Trust Company, 261 F. 765, in which it is held that the after-acquired property clause of a mortgage executed by a mortgagor whose title was later transferred to a new company in reorganization is not binding upon the latter unless the covenants and conditions of the mortgage have been assumed. In resisting this claim it was asserted by and on behalf of the trustees under the underlying mortgages of the predecessor Railroad Company on authority of the decision of the Circuit Court of Appeals in this Circuit in Guaranty Trust Company v. Minneapolis & St. Louis Railroad Company, 36 F.2d 747, that an assumption of the covenants and conditions of the early mortgages by the defendant Railway Company may be implied and that an instrument executed by the defendant Railway Company under authority of the Executive Committee of its Board of Directors on November 18, 1930, expressly assuming the covenants, agreements, stipulations and provisions of the underlying mortgages of the predecessor Railroad Company was in the nature of an instrument of further assurance evidencing the intent of the arrangements perfected in and dating back to 1915. The validity of this instrument was attacked by the trustee of the refunding and general mortgage because (a) not specifically authorized by the Interstate Commerce Commission under Section 20a of the Interstate Commerce Act and (b) not specifically authorized by the stockholders of the defendant Railway Company. On behalf of the bonds secured by the underlying mortgages it was claimed that such authorization was unnecessary because of the prior authorization by both the Interstate Commerce Commission and the stockholders of the refunding and general mortgage which contains a qualified assumption of liability in respect of all underlying bonds.

Obviously this controversy was a genuine one, involving close questions of the interpretation and effect of after-acquired property clauses as well as the interpretation and application of judicial decisions upon a very complex statement of facts and was a controversy the outcome of which no one could predict; it was precisely the kind of controversy which the Court thinks should be settled in order that the proceeding might be administered "in an economical and practical manner."

This controversy, the critical problem of the reorganization, was settled upon the assumption that if pressed to a final judicial determination the refunding and general mortgage would be held to cover sufficient equipment free from the liens of underlying mortgages to provide for payment in full of all receivers' certificates held by Reconstruction Finance Corporation provided that such equipment could be sold at its depreciated book value. This compromise was reached after the evidence desired by all of the parties had been received and briefs had been filed, all of which have been made available to the Court in its determination whether the compromise or adjustment is fair and equitable.

It may be noted that this division of equipment would be the approximate result of a judicial determination (a) that the defendant Railway Company had not assumed the covenants and provisions of the underlying mortgages prior to November 18, 1930, and that in consequence of its failure to do so all equipment acquired between November 1, 1915, and November 18, 1930, including the equity on the latter date in all equipment subject to equipment trust agreements, was subject to the refunding and general mortgage as a first lien thereon, a lien subsequently displaced by order of this Court in favor of the receivers' certificates issued to Reconstruction Finance Corporation and (b) that on and after November 18, 1930, all equipment acquired, including such part of the equity in equipment subject to equipment trust agreements as represented principal payments thereunder after that date, became subject to the prior liens of some one or more of the underlying mortgages.

Reconstruction Finance Corporation on its part agreed to this adjustment or com-

promise and agreed to accept payment of all receivers' certificates held by it (except receivers' certificates, Series A, in the amount of $4,575,000) in new securities of Wabash Railroad Company as follows: 75% in new 30-year first mortgage 4% bonds and 25% in new 40-year income mortgage 4% bonds, Series A. This adjustment or compromise on the part of Reconstruction Finance Corporation was approved by the Interstate Commerce Commission by its report and order in Finance Docket No. 13010 dated July 29, 1941.

■ The Court having considered all the factors, both factual and legal, approves this adjustment or compromise of this exceedingly intricate and difficult lien controversy as fair, equitable and wise from the standpoint of all of the parties.

■ Other controversial issues between the parties related primarily to the development of a complete formula for the allocation of system earnings to mortgage sections. These controversies are no longer of significance. The agreed upon allocations of the new securities of Wabash Railroad Company to holders of securities of the defendant Railway Company are based primarily upon the traffic density charts which ordinarily reflect the true earning power of the different parts of the system. Adjustments of conclusions drawn from the traffic density charts may be necessary for special situations. A recurring example is where a particular section showing high traffic density may be heavily weighted by the movement of system fuel or non-revenue freight. A further example is the failure of these charts to reflect exceptional operating costs or extraordinary terminal expenses. Nor do these charts show the value of traffic contributed to the system by the low traffic density lines. But over a period of years the charts showing where the traffic actually moves appears to be the most reliable guide to the sources of the system revenues. The Court assumes that any deviations that could be justified were not overlooked in the negotiations and are reflected in the final adjustments under the plan, which may now in its essential features be analyzed and discussed.

Provison is made for the assumption by Wabash Railroad Company of $10,615,000 of existing obligations which are obligations created or guaranteed by the receivers. These consist of an issue of $2,025,000 of first mortgage 4% serial bonds of Wabash-St. Charles Bridge Company, created during receivership to finance in part a new bridge across the Missouri River at St. Charles; and an issue of $50,000 of Wabash-Hannibal Bridge Company first mortgage 3½% serial notes created during receivership to secure proprietorship of the bridge across the Mississippi River at Hannibal, Missouri, theretofore operated under an onerous lease (the last of these notes matured since the effective date of the plan and has been paid); and $8,540,000 of equipment trust certificates. Each of these obligations represents a definite operating economy and an increase in system income. Especially is this true of the equipment trust certificates. At the date of the appointment of receivers, equipment trust certificates were outstanding in the amount of $16,164,600, bearing interest at the weighted average rate of 4.98%. These were reduced to $6,400,000 and on April 1, 1940, were refinanced and $2,750,000 of new money was secured for rebuilding 1,694 box cars, for which purposes $9,150,000 of 2½% certificates were issued. Subsequent payments of principal reduced them to $8,540,000 as of January 1, 1941, so whereas as of the date of receivership interest on equipment obligations was at the annual rate of $804,936, it is reduced as of the date of the plan to only $213,500.

By order of the Court dated January 30, 1940, interest payments on certain underlying bonds and receivers' certificates were authorized in the amount of $1,313,015. As part of the plan this interest and interest on receivers' certificates to the effective date of the plan is to be paid in cash. All other interest is to be adjusted through new securities of the same grade as are used for the adjustment of principal in accordance with the decision of the Supreme Court in the Consolidated Rock Products case.

The next major problem was a fair and equitable distribution of $47,354,241 principal amount of new first mortgage 4% bonds of Wabash Railroad Company among the claimants. By reference to the traffic density charts it was clear that three of the seven issues of first mortgage bonds were consistently heavy contributors to system income—the first mortgage dated May 1, 1889, under which Central Hanover Bank and Trust Company is trustee; the Detroit and Chicago Extension first mortgage dated July 1, 1891, under which Central Hanover Bank and Trust Company is trustee; and the Toledo and Chicago Division first mortgage dated June 1, 1901, under which

Irving Trust Company is trustee. These three issues of first mortgage bonds, each of which was secured by a first mortgage upon essential lines of the highest traffic density, were determined to be entitled at least to parity of treatment with the receivers' certificates. One of these seven issues of bonds—the first lien terminal bonds—was secured by title to terminal facilities and hence was not shown on the traffic density charts. There have been a number of independent appraisals of its properties which (as is ordinarily the case) differed; but it was the judgment of the defendant Railway Company, a judgment ultimately accepted in negotiation by the parties as the basis of an adjustment or compromise, that the terminal properties were at least equal to the face of the debt; that not less than one-half, perhaps more, was represented by indispensable properties, producing income at least sufficient to provide a 4% return on the bonds; but in view of the fact that part of the property was held for future development it was determined to issue first mortgage bonds in respect only of the income producing properties estimated to be approximately 50%. Brief reference may here be made to the lien position of the three underlying mortgages that are to participate substantially on a parity with Reconstruction Finance Corporation in the division of the new first mortgage bonds. The first mortgage dated May 1, 1889, is the most important from the standpoint of the extent of the mileage covered and the amount of the issue—$33,891,000 of principal and $5,366,075 of accrued interest; it covers 1,465.08 miles of first main track, both east and west of the Mississippi River and 341 miles of other track; the lines covered are of the highest traffic density in the system. The Detroit and Chicago Extension first mortgage dated July 1, 1891, originally secured an issue of $3,500,000 bonds which have been reduced by sinking fund payments to $1,844,000 and upon which there was accrued interest of $276,-600; it constitutes a first lien on the line from Montpelier, Ohio, to Clarke Junction, near Chicago, Illinois, and the business between Chicago and Detroit moves on these rails; and it also is a line of the highest traffic density. The Toledo and Chicago Division first mortgage dated June 1, 1901, is a first lien on the line between Maumee, near Toledo, and Montpelier, Ohio, a line of lower traffic density; the amount of the Toledo and Chicago Division first mortgage is $3,000,000 and the accrued interest $340,-000. In addition, it holds a second lien on the high traffic density line of the Detroit and Chicago Extension, a lien of definite value because of the low bonded debt per mile secured by the lien on the Detroit and Chicago Extension. These three mortgages were deemed prime security and the bonds secured thereby entitled to receive 100% of their principal and interest in the highest grade security available after giving adequate recognition to the first lien terminal bonds. They are given parity of treatment with each other and with the receivers' certificates held by Reconstruction Finance Corporation, except that a slightly larger allotment of new first mortgage bonds is made to the Detroit and Chicago Extension first mortgage bonds (90% instead of 75%) for the special reasons already mentioned; that is, high traffic density and low bonded debt per mile due to sinking fund retirements. These allocations, together with further allocations (37½% to receivers' certificates, Series A and Series B) entirely absorb the issue of $47,354,241, leaving a substantial part of the indebtedness to be provided for in a junior security. To this end, $17,510,012 principal amount of 40-year 4% income bonds, Series A, (less $836,665 assigned to the second mortgage for reasons to be explained at a later point) were allocated in sufficient amounts to bring the total allotment of each up to 100% of the total debt due January 1, 1941, after deducting any cash payable on that date under the Court's order of January 30, 1940.

In the judgment of the parties themselves and of the experts on the staff of the receivers these allocations are fair and equitable, are supported by the earnings' experience of the property, are consistent with the valuations of the Interstate Commerce Commission under Section 19a of the Interstate Commerce Act introduced in evidence, and accord with the rule of absolute priority; that to the extent there is a change in the grade or character of the existing security by the substitution of income bonds, deemed a security of a lower grade than a fixed interest bearing obligation, adequate compensation is provided. No problem exists as to interest rates because, except in the case of matured indebtedness, the new rates are not lower. The following items, among others, have been specified as constituting the full compensation contemplated by the Supreme Court's decision in Consolidated Rock Products case:

(a) Substitution for liens on broken mileage a continuous lien on the entire system;

(b) A lien on all system rolling stock and other equipment;

(c) A lien on all essential terminals;

(d) A lien on the system leaseholds including income producing mileage between Windsor, Ontario, and Buffalo, New York;

(e) A lien on the entire equity of the Ann Arbor Railroad Company which will be simultaneously discharged from receivership in a substantially improved position;

(f) A lien upon other items of valuable and income producing properties heretofore subject only to the lien of the refunding and general mortgage.

■ The Court holds that the allocations of new securities under the plan to the receivers' certificates held by Reconstruction Finance Corporation, exclusive of Series A hereafter separately considered, to the first mortgage bonds, to the Detroit and Chicago Extension first mortgage bonds, to the Toledo and Chicago Division first mortgage bonds and to the first lien terminal bonds are fair and equitable; that to the extent that their existing status is altered or they are offered new securities of a lower or different grade they receive adequate compensation; and that as to them the plan complies with the rule of absolute priority as asserted in the Consolidated Rock Products case.

■ Receivers' certificates, Series A, in the amount of $4,575,000 held by Reconstruction Finance Corporation and receivers' certificates, Series B, in the amount of $4,491,411, held by certain banks, are to be retired through the issue of 37.5% of the principal amount thereof in first mortgage 4% bonds, 12.5% in income A 4% bonds and 50% in serial collateral 1½% notes of Wabash Railroad Company. These receivers' certificates are secured by the following collateral owned by the Railway Company and held by banks at the date of the appointment of receivers: 258,929 shares of the common capital stock of the Lehigh Valley Railroad Company; 1,217 shares of the capital stock of the American Refrigerator Transit Company; 8,250 shares of the capital stock of the New Jersey, Indiana & Illinois Railroad Company; and certain first lien terminal bonds to be cancelled in reorganization. Early in the receivership the question arose whether the receivers should protect the collateral.

The Chase National Bank of the City of New York, as trustee under the refunding and general mortgage, sought the expert advice of Mr. Ralph Budd, president of the Chicago, Burlington & Quincy Railroad Company, and at the present time the transportation expert appointed by the President of the United States as a member of the Defense Commission. Mr. Budd, after surveying the situation, advised protection of the collateral. This coincided with the independent judgment of the receivers and thereupon, with the approval of the Interstate Commerce Commission, the Series A and Series B certificates were created for that purpose; approximately 50% of the money necessary to pay off the banks was provided by Reconstruction Finance Corporation and the banks accepted Series B certificates for the balance. Under the plan of reorganization, serial collateral 1½% notes are to be issued for the full amount of the Series A and Series B certificates and those not issued direct to the holders of the Series A and Series B certificates are to be pledged under the new first mortgage. By this arrangement Wabash Railroad Company will in effect purchase the collateral in twelve annual installments by payment over a twelve year period of the serial collateral 1½% notes. Here there is no question of priority or a violation of a rule of priority. The shares of stock of both the American Refrigerator Transit Company and the New Jersey, Indiana & Illinois Railroad Company are regarded as integral system assets, the loss of which would seriously impair income. The only question is one of business judgment. The Court is impressed with the efforts made by all interested parties to reach the correct judgment and by the fact that the correctness of the judgment which was reached has been twice confirmed by action of the Interstate Commerce Commission.

■ There still remains for consideration four of the seven issues of first mortgage bonds included in the capital structure of the defendant Railway Company: Des Moines Division first mortgage 4% bonds in the principal amount of $1,600,000 and accrued interest as of January 1, 1941, of $204,800, a total indebtedness of $1,804,800; Omaha Division first mortgage 3½% bonds, $3,160,500, and accrued interest, $370,569, a total indebtedness of $3,531,069; and the first mortgage 4% bonds of the Columbia and St. Louis Railroad Company

in the principal amount of $200,000 and accrued interest in the amount of $26,933, a total indebtedness of $226,933. These three issues of divisional first mortgage bonds are identically situated. Each issue is secured by a paramount lien on severable mileage which is not self-sustaining. Elaborate studies, which have been made available to the respective mortgage trustees and to holders of substantial amounts of the bonds, have been prepared. All agreed that the Des Moines Division was the strongest of the three properties; the mortgage constitutes a lien on approximately 90 miles of railway from Moulton to Des Moines and also a lien on an undivided half-interest in the Des Moines Union Railway Company and by reason of a 50% stock interest in that company participated in switching and other outside revenue; its relation to the terminal situation is established by the decision of the Supreme Court of the United States in the case of Chicago, Milwaukee & St. Paul Railway Company v. Des Moines Union Railway Company, 1920, 254 U.S. 196, 41 S.Ct. 81, 65 L.Ed. 219. Although upon the basis of actual studies the line was not self-sustaining per se, the traffic contributed to the system was found to be profitable. On the basis of this factor it was determined to allot to these bonds 70% in 50-year 4¼% income bonds, Series B, and 30% in 4½% preferred stock. The studies on the Omaha Division, extending from Pattonsburg, Missouri, to Council Bluffs, Iowa, (including a bridge connection with Omaha, Nebraska, rented from the Union Pacific Railroad Company) presented a less favorable situation and the offer here is 10% in 50 year 4¼% income bonds, Series B, and 90% in 4½% preferred stock. The settlement proposed for the small issue of first mortgage bonds of the Columbia and St. Louis Railroad Company, due to its contributions to system earnings, is the same as that offered the bonds secured by the first mortgage upon the Des Moines Division. Again it should be made clear that these are detachable divisions and are to remain in the system on terms commensurate with their value to the system. No question of priority arises.

There remain two issues of underlying mortgage bonds junior in rank to the first mortgage upon the lines or part thereof subject to the last mentioned mortgage—the second mortgage dated February 1, 1889, under which Manufacturers Trust Company is trustee, securing an issue of $13,993,146.75 principal amount of second mortgage bonds and scrip, and the debenture mortgage dated July 1, 1889, under which Bankers Trust Company is trustee, securing $1,248,450 of debenture mortgage bonds and scrip of which $200,326 is publicly held and the balance is pledged under the refunding and general mortgage, except a small amount in the treasury:—those not publicly held to be cancelled under the plan.

The second mortgage is a second lien upon all the lines east of the Mississippi River upon which the first mortgage is a first lien and in addition is a first lien upon any equipment, original or substituted in replacement, acquired from an equipment trust association predating the reorganization of the predecessor of the defendant Railway Company. The debenture mortgage is a third lien upon these properties and a second lien upon the lines west of the Mississippi River subject to the first lien of the first mortgage. These two junior underlying mortgages are given parity of treatment (except that the second mortgage receives an allotment of $836,665 of 40-year 4% income bonds, Series A, in place of a like amount of 50-year 4¼% income bonds, Series B, in respect of its equipment lien claim) without penalty or assessment or contribution, 70% in income bonds and 30% in preferred stock. In our judgment these allotments comply with the rule of relative priority and in view of the very substantial contributions, of which they are beneficiaries, made by the refunding and general mortgage bonds to enlarge and strengthen the senior liens and increase earning power of the system properties comply also with the rule of strict priority asserted in Consolidated Rock Products case.

Coming back now to the issue of refunding and general mortgage bonds representing principal indebtedness of $60,-867,000 and accrued interest of $28,089,222, a total indebtedness as of the effective date of the plan of $88,956,222. In settlement of this indebtedness, the holders of the refunding and general mortgage bonds receive 10% in 50-year 4¼% income bonds, Series B, 25% in 4½% preferred stock and 65% in no par common stock taken at $100 per share. Except as to their participation to the extent of 10% in income B 4¼% bonds and 25% in 4½% preferred stock with holders of the bonds secured by divisional mortgages on low traffic density sections of railway and bonds secured by junior underlying bonds whose relative pri-

orities were preserved—a participation fully justified by their first lien position with respect to many properties, many of which are income producing properties heretofore mentioned—they take a junior position. Considering the total amount of property covered by the refunding and general mortgage as a first lien and as to which its seniority is not in dispute, all of which has been contributed to strengthen and support the security of the new senior mortgages, it may fairly be said that in all of its aspects the plan of reorganization is fair and equitable and complies with the letter and spirit of the decision of the United States Supreme Court in Los Angeles Lumber Products case and Consolidated Rock Products case.

No provision is made in the plan for an exchange of new securities in satisfaction of the claims of the unsecured creditors of the defendant Railway Company nor for the exchange of the outstanding stock of the Railway Company for securities to be issued by the reorganized Wabash Railroad Company.

As to claims of unsecured creditors of the Railway Company, the record shows that all such claims usually accorded a preferential status in cases of this kind have been paid by the receivers, with authority of the Court, as a part of their expenses of operation. The record further shows that more than three hundred nonpreferential claims were filed with and heard by the Special Master, and out of that number about 140 of the claims so filed were allowed against the Railway Company and classified as unsecured general creditor claims. The record before the Court clearly shows the Railway Company to be hopelessly insolvent and unable to pay its secured indebtedness, already matured, by many millions of dollars, thus leaving no equity in the insolvent's estate for the benefit of the unsecured general creditors. Notwithstanding the conditions here referred to the receivers, with the informal consent of a majority in interest of the holders of bonds and receivers' certificates having prior liens on the entire properties of the Railway Company, recommended to the Court, and the Court approved, the making of compromise settlements of the unsecured general creditor claims as allowed by the Special Master on the basis of a cash payment equal to twenty-five per cent of the principal amount of the respective claims. All but nine of the claims of the class re-

ferred to, and aggregating less than $7,000, were compromised, settled and paid on the terms of the receivers' offer; and the Court finds that, on the facts of record in this case, the offer by the receivers for compromise settlement of the claims of the unsecured general creditors of the defendant, Wabash Railway Company, is fair and equitable; and the Court further finds that the said offer of compromise settlement should be continued in effect by the receivers for acceptance by those few creditors who heretofore have declined acceptance, or who have failed to respond to the receivers' offer. In this connection it should be noted that when, on March 17, 1941, the Court set the plan of reorganization for hearing on April 24, 1941, due and timely notice of the time and place of the hearing was given to each of the non-accepting creditors hereinabove referred to but none appeared, either in person or by counsel.

We now come to a consideration of the position of the stockholders of the defendant Railway under the plan. As hereinbefore stated, the receivers, pursuant to orders of this Court, caused Wabash Railroad Company to be organized, and to make appropriate applications to the Interstate Commerce Commission for such authorizations as are required in cases of this kind by the provisions of the Interstate Commerce Act, as amended. The applications were filed and full hearings thereon were held by the Commission. On July 29, 1941, the Commission issued its report and findings thereon, which have been filed herein and made a part of the record in this cause. We have already referred to the comprehensive scope of the Commission's investigation into the past and prospective earnings of the defendant Railway Company, its capital structure, its assets and liabilities, fixed charges and the valuation of its properties, as disclosed by its report and findings. The evidence taken at the hearings before the said Commission, in all substantial respects, was also introduced in evidence at the hearing before the Court, held on April 24, 1941. The transcript of the testimony then taken and the 59 exhibits introduced in evidence are entirely too voluminous to be set forth in detail in this opinion. It will suffice to state that the conclusions of the Court upon each of the questions involved is in accord with the said report and findings of the Interstate Commerce Commission, and the Court refers interested parties to the printed copy

thereof appearing as a part of the printed record in this cause. From the evidence referred to it is made clear that the earlier plans for the reorganization provided for a substantial assessment to be levied against the stockholders of the defendant Railway Company and permitted stockholders who paid the assessment to participate in the reorganization; that none of the principal stockholders was willing to pay an assessment for such participating rights, and no responsible offer to underwrite an assessment plan was forthcoming; hence that plan finally had to be abandoned for the present plan under which all new common stock (no par value) of the reorganized company is to be placed in escrow and unless withdrawn within a stated period by the owners, who except as to a relatively negligible part of the stock, will be the owners of the refunding and general mortgage bonds of the defendant Railway Company, shall be subject to sale at the price of $12.75 per share, $1 of which is to be retained by the reorganized company to provide in part the cash requirements of the plan. The primary right to purchase this stock at this price is accorded the stockholders in the order of their respective priorities.

No stockholder appeared at the hearing held by the Court on April 24, 1941, although due notice of the hearing was given to each stockholder of record, and no substantial objection to the plan was made in any form by any stockholder; and the Court, upon due consideration of the evidence taken at the hearing referred to finds that the plan is not unfair nor inequitable by reason of the fact that it fails to provide for a greater or different form of stockholders participation in the reorganization than that provided by the plan. The evidence before the Court and the report and findings of the Interstate Commerce Commission made upon the application of the Pennsylvania Railroad Company and the Pennsylvania Company in Interstate Commerce Commission Finance Docket No. 13235, and filed as a part of the record in this cause, show that as holders of 48.93% of the stock of the defendant Railway Company they are willing to purchase 50%, or more, of the new common stock on the terms above stated. Doubtless many other holders of stock will avail themselves of the purchase rights accorded them by the plan, and the Court feels confident that the plan will not fail from a lack of cooperation on the part of the stockholders of the defendant Railway Company or from the owners of the new common stock provided to be issued under the plan.

At the hearing on April 24, 1941, the absence of substantial opposition to the plan was significant. There were less than twenty responses to more than 13,000 notices inviting criticism of the plan. No suggestion was made not fully covered by what has already been said in the course of this opinion.

The Manufacturers Trust Company, as trustee under the second mortgage, filed a technical objection based upon the compromise allotment of $836,665 of 4% income bonds, Series A, in respect of its claim of a first lien upon not less than $3,000,000 of equipment; it asks a judicial determination that this is a fair compromise as required by the decision of the Supreme Court in the Los Angeles Lumber Products case. The Court has considered the evidence showing, among other things, that this claim rests upon covenants to replace equipment predating the 1889 reorganization and finds that the compromise provided for by the plan is fair and equitable.

Certain holders of substantial amounts of debenture mortgage bonds have asked for better treatment for these bonds based upon the earnings' record of the lines west of St. Louis upon which the debenture mortgage constitutes a second lien. At the hearing, however, it was pointed out that interest was paid regularly upon these bonds until there was a default under the first mortgage, followed by an impounding of income for the benefit of the first mortgage bondholders. Upon consideration of all the facts, the Court finds that the offer provided for by the plan to the holders of the debenture mortgage bonds is fair and equitable.

A single holder of refunding and general mortgage bonds objected to the plan and his objections have been considered by the Court. They do not involve any question of priority but relate primarily to the terms upon which present stockholders are offered the privilege of purchasing the stock left in escrow subject to sale as provided for in by the plan. Apparently he ignores the fact that the sale of the escrowed stock is not obligatory and that any refunding and general mortgage bondholder may retain the stock allotted to him under the plan.

■ At the hearing on April 24, 1941, evidence offered in support of the plan and the allocations of securities thereunder included the presentation of fifty-nine exhibits. These exhibits covered a wide field and included evidence of the value of the properties as shown by the valuation reports of the Interstate Commerce Commission in the performance of its statutory duties under Section 19a of the Interstate Commerce Act; charts showing the lines of railway of the defendant Railway Company and the mortgage liens thereon as they appear on the records of the defendant Railway Company; financial exhibits showing the result of operations of the property over a long period of years and income studies for selected periods, and continuous periods, and the earnings of the property—past, present and prospective; and, as already stated, traffic density charts covering a period of five years—but there was evidence disclosing that the traffic density charts would not indicate different results if they were projected much further into the past. The Court has considered all of this evidence, as well as the evidence summarized in the several reports of the Interstate Commerce Commission, in reaching its determination that the capitalization of the Wabash Railroad as proposed by the plan of reorganization should be approved as in the public interest.

Although as already shown the allocations under the plan were the result of tedious negotiations in which independent earnings' studies and other studies developed by the receivers or their staffs were given consideration, the plan in its final form was reviewed by an independent expert who tested the allocations of securities by the application of a formula referred to as the net ton mile formula, and found the allocations to be fair and equitable.

The group of holders of underlying mortgage bonds and the group of holders of refunding and general mortgage bonds, through their representatives, have accepted all of the essential adjustments and compromises underlying the plan and have supported the plan, subject, however, to participation therein of the Pennsylvania Railroad Company or the Pennsylvania Company. By their representatives they have stated in open Court that they have agreed to these adjustments and compromises, upon the condition that the Pennsylvania Railroad Company or the Pennsylvania Company shall become the controlling stockholder.

■ The Interstate Commerce Commission has already granted to the Pennsylvania Railroad Company and the Pennsylvania Company necessary authority to acquire control of the reorganized company by purchase of its capital stock under Section 5(2) of the amended Interstate Commerce Act and it is assumed that the necessary stock which is to be placed in escrow will be made available. Its participation in the plan is, however, an integral part of the adjustments or compromises which underlie the plan and it is essential that full protection be accorded the parties who have made the compromises and accepted the plan upon that condition. To this end the Court will retain by express reservation complete jurisdiction of this cause, notwithstanding the sale and transfer of the properties of the defendant Railway Company to Wabash Railroad Company or to any other company, with full power to retake and ultimately to resell the properties and upon such retaking to proceed de novo, assuring to all parties their rights as they now exist, including the right to litigate all issues as if the plan of March 15, 1941, and the earlier plan had not been submitted. This is in conformity with the rule that has always governed the efforts of parties to compromise or amicably adjust their controversies. The law particularly favors the settlement of controversies and this applies with great force to those that arise in the complicated reorganizations that are a familiar part of the jurisdiction of the Federal District Courts. As already shown, the Supreme Court expressly so held in the Los Angeles Lumber Products case. No one shall be prejudiced in any of his rights if through some untoward circumstance the present plan shall fail of accomplishment.

Let counsel for Wabash Railroad Company, which at the hearing on April 24, 1941, entered its appearance herein, prepare and submit findings of fact and conclusions of law consistent herewith and a form of order or decree to be entered hereon which shall embody the Court's conclusions in the premises and shall provide for a further hearing of this cause to take evidence in support of all of the bills of foreclosure, all of which shall be deemed to be at issue as upon a general denial, and to determine the description for the final decree of foreclosure and sale of the prop-

erties to be included in each separate parcel of the railroads and property of the defendant Railway Company and the upset price to be named therein for each such parcel and such other matters as may be embraced in such decree or decrees in order to facilitate the sale or sales thereunder and expedite the consummation of said plan of reorganization dated March 15, 1941.